**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

MINDY GILSTER,

        Plaintiff,

vs.

PRIMEBANK, PRIMEBANK, INC.,
and JOSEPH STRUB,

        Defendants

No. C 10-4084-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
POST-TRIAL MOTIONS**

---

**TABLE OF CONTENTS**

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**II. BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**III. ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   **A. Defendants' Motion For Judgment As A Matter of Law,
      New Trial, Or Remittitur** . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      **1.** *Judgment as a Matter of Law on Liability Issues* . . . . . . . . . . 6
         **a.** *Sufficiency of the Evidence—Sexual Harassment* . . . . . 8
         **b.** *Sufficiency of the Evidence—Retaliation* . . . . . . . . . . 14
      **2.** *Judgment as a Matter of Law and Remittitur on Damages* . . 22
         **a.** *Punitive Damages* . . . . . . . . . . . . . . . . . . . . . 22
         **b.** *Emotional Distress Damages* . . . . . . . . . . . . . . . . 26
         **c.** *Back Pay and Medical Expenses* . . . . . . . . . . . . . 32
      **3.** *New Trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   **B. Gilster's Motion For Equitable Relief And Front Pay** . . . . . . . . . . 47
      **1.** *Front Pay* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
         **a.** *Factors in Determining Front Pay* . . . . . . . . . . . . . 48
         **b.** *Calculation of Front Pay* . . . . . . . . . . . . . . . . . 55
      **2.** *Injunction Against Primebank* . . . . . . . . . . . . . . . . . 64

         **3.**      *Additional Equitable Relief—Letter of Reference* . . . . . . . .  70

   *C. Gilster's Motion for Attorney Fees and Costs* . . . . . . . . . . . . . . .  72

         **1.**      *Applicable Standards* . . . . . . . . . . . . . . . . . . . . . . . . .  74

         **2.**      *Reasonable Hourly Rates* . . . . . . . . . . . . . . . . . . . . . .  77

         **3.**      *Reasonable Hours Worked* . . . . . . . . . . . . . . . . . . . . .  80

             *a.*      *Reduction for Block-billing* . . . . . . . . . . . . . . . . . .  81

             *b.*      *Reduction for Lack of Specificity*    . . . . . . . .  83

             *c.*      *Reduction for Failure to Follow Local Rule* . . . . . . . .  84

             *d.*      *Reduction for Overstaffing*  . . . . . . . . . . . . . . . .  84

             *e.*      *Problems with Billing Judgment and Format*  . . . . . .  88

         **4.**      *Calculation of Fees* . . . . . . . . . . . . . . . . . . . . . . . . . .  90

         **5.**      *Award of Costs* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92

   *D. Interest* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

         **1.**      *Pre-judgment Interest* . . . . . . . . . . . . . . . . . . . . . . . .  101

         **2.**      *Post-judgment Interest* . . . . . . . . . . . . . . . . . . . . . . . .  102

**IV. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103

   *A. Orders Regarding Post-Trial Motions* . . . . . . . . . . . . . . . . . . . . .  103

   *B. Summary of Damages* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  104

   *C. Order for Judgment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  104

## I. INTRODUCTION

Plaintiff Mindy Gilster testified at trial, "I wanted to be left alone, and I wanted to do my work . . . ." Gilster expected, as an employee with defendant Primebank, only the simplest guarantee of workplace equality promised by Title VII and the Iowa Civil Rights Act. "Men and women have every right to be left alone without sexual abuse in the workplace." *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 762 (8th Cir. 2003). Likewise, men and women have every right to be left alone after they report sexual harassment. A jury found that defendants Joseph Strub and Primebank violated these basic tenets of our civil rights laws when Joseph Strub sexually harassed Mindy Gilster and, later, when Strub and Primebank retaliated against Gilster for reporting the

sexual harassment and retaliation she experienced. The jury awarded a total of $900,301.22 in damages.

Before me now are the parties' post-trial motions.

## II. BACKGROUND

This sexual harassment and retaliation case arose from plaintiff Mindy Gilster's employment with Primebank at its Sioux City, Iowa, branch, where she worked as a credit administrator from December 3, 2007, until her termination on February 10, 2011. Gilster brought claims of sexual harassment and retaliation, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Iowa Civil Rights Act (ICRA), IOWA CODE § 216 *et seq.*, against Primebank, Primebank, Inc.,[1] and Joseph Strub, Primebank's Sioux City market president and Gilster's supervisor, alleging that Joseph Strub sexually harassed her and that Strub and Primebank retaliated against her for reporting the sexual harassment and for reporting retaliation.

Beginning April 3, 2012, the parties tried the case to an eight-person jury. Following seven days of evidence and argument, the case was submitted to the jury on the

---

[1] In the instructions to the jury, I referred to Primebank and Primebank, Inc., collectively, as "Primebank." There was no evidence presented at trial regarding Primebank, Inc. The defendants, at the close of Gilster's evidence, moved for judgment as a matter of law on all claims as to all defendants, based on sufficiency of the evidence. Additionally, as to Primebank, Inc., the defendants argued that Primebank, Inc. was not a proper defendant in this case. Gilster indicated she did not oppose releasing Primebank, Inc. I denied the defendants' motion in its entirety. As to Primebank, Inc., I denied the motion because I was not convinced that the record was clear that Primebank, Inc. was an improper defendant.

The parties, however, agreed at oral arguments on the pending motions that Primebank, Inc. is not a proper defendant in this case. Therefore, Primebank, Inc. is dismissed from this case by agreement of the parties.

morning of April 11, 2012. After approximately six hours of deliberation, the jury returned its verdict on April 11, 2012, in favor of Gilster on both her sexual harassment and retaliation claims. On Gilster's sexual harassment claim, the jury found that Joseph Strub's sexual harassment resulted in a significant change in employment status and that the harassment was sufficiently severe or pervasive to create a hostile environment.[2] For both Gilster's sexual harassment and retaliation claims, the jury rejected the defendants' partial "after-acquired evidence" defense, determining that the defendants failed to prove that, even if they had not terminated Gilster on February 10, 2011, they would have terminated her on September 1, 2011, the date on which they discovered she had been forwarding e-mails to her attorneys from her work e-mail during work hours.[3]

The jury awarded Gilster a total of $900,301.22 in damages, broken down as follows: on Gilster's sexual harassment claim, $20,000 for past emotional distress, $60,000 for future emotional distress, $28,820.12 in back pay, $1330.49 for past medical expenses, and $200,000 in punitive damages; on Gilster's retaliation claim, $20,000 for

---

[2] The verdict form included a section entitled "Nature of Harassment," in which the jury was instructed, if it found in Gilster's favor on her sexual harassment claim, to indicate whether Gilster had proven either or both of the following: "(a) The harassment resulted in a significant change in employment status"; "(b) The harassment was sufficiently severe or pervasive to create a hostile environment." The jury indicated Gilster proved both. *See* Verdict Form (docket no. 71 at 1).

[3] The verdict form included an "After-acquired Evidence" section for both the sexual harassment and retaliation claims, in which the jury was instructed to check "yes" or "no" in response to the following question: "Have the defendants proved that, even if Ms. Gilster had not been terminated on February 10, 2011, the defendants would have terminated her employment on September 1, 2011, because she had been forwarding e-mails to her attorneys from her work e-mail during work hours?" The jury checked "No" in response to this question on both the sexual harassment and retaliation claims. *See* Verdict Form (docket no. 71 at 2-3).

past emotional distress, $140,000 for future emotional distress, $28,820.12 in back pay, $1330.49 for past medical expenses, and $400,000 in punitive damages. The question of whether to grant reinstatement or front pay was left for me to decide.

At a telephonic status conference on April 18, 2012, I set a 30-day deadline for any post-trial motions and indicated to the parties that I would defer entry of judgment until after resolution of the parties' post-trial motions. Before me now are Gilster's May 17, 2012, Motion For Equitable Relief And Front Pay (docket no. 80); Gilster's May 17, 2012, Motion For Attorneys' Fees And Expenses (docket no. 81); and the defendants' May 18, 2012, Motion For Judgment As A Matter Of Law, New Trial, Or Remittitur (docket no. 82).

The parties presented three hours of oral argument on these motions on July 5, 2012. Brooke Timmer and Whitney Judkins, of Fiedler & Timmer, P.L.L.C., in Des Moines, Iowa, appeared for Gilster, and Douglas Phillips, of Klass Law Firm, L.L.P., in Sioux City, Iowa, appeared for Primebank and Joseph Strub. The lawyers in this case have been exceptionally well-prepared and have represented their clients with great effort and skill. It has been a pleasure to preside over the trial and the pending motions.

### III. ANALYSIS

I now turn to the analysis of the parties' post-trial motions, beginning with the defendants' Motion For Judgment As A Matter Of Law, New Trial, Or Remittitur.

#### A. Defendants' Motion For Judgment As A Matter of Law, New Trial, Or Remittitur

The defendants renew their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. They urge that insufficient evidence existed for the jury to

find in Gilster's favor on her sexual harassment and retaliation claims. The defendants also move for judgment as a matter of law and, in the alternative, remittitur on punitive damages. Additionally, the defendants move for judgment as a matter of law on future emotional distress damages and, in the alternative, move for remittitur on future and past emotional distress damages. They also request remittitur on the jury's award of back pay and medical expenses. Finally, the defendants move for a new trial, based on comments Gilster's counsel made in her rebuttal closing argument. I take each issue in turn.

## 1.    *Judgment as a Matter of Law on Liability Issues*

The defendants argue that the evidence produced at trial was insufficient to support the jury's verdict in favor of Gilster on her sexual harassment and retaliation claims.[4] Pursuant to Federal Rule of Civil Procedure 50, a court may only grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). The standard for judgment as a matter of law is exacting, as "[a] jury verdict is entitled to extreme deference . . . ." *Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1009 (8th Cir. 2008). The Eighth Circuit Court of Appeals has explained that "'[t]his demanding standard reflects our concern that, if misused, judgment as a matter of law can invade the jury's rightful province.'" *Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 662 F.3d 497, 503 (8th Cir. 2011) (quoting *Gardner v. Buerger*, 82

---

[4] In determining whether the evidence at trial was sufficient to support Gilster's sexual harassment and retaliation claims, I analyze Gilster's claims under Title VII and the ICRA together. *See E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 693 (8th Cir. 2012) (analyzing Title VII and ICRA hostile environment and retaliation claims and noting that "the [ICRA] is interpreted in the same way as Title VII").

F.3d 248, 251 (8th Cir. 1996)). A court may not disturb the jury's verdict "unless, after viewing the evidence in the light most favorable to [the non-movant], [it] conclude[s] that no reasonable jury could have found in [the non-movant's] favor." *Heaton v. The Weitz Co., Inc.*, 534 F.3d 882, 887 (8th Cir. 2008) (citation and internal quotation marks omitted). In other words, a court "will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict." *Id.* (citation and internal quotation marks omitted). In evaluating whether the evidence was sufficient to support a verdict in Gilster's favor, I must:

> (1) resolve direct factual conflicts in favor of [Gilster], (2) assume as true all facts supporting [Gilster] which the evidence tended to prove, (3) give [Gilster] the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*See United Fire & Cas. Ins. Co. v. Garvey*, 419 F.3d 743, 746 (8th Cir. 2005) (quoting *Pumps and Power Co. v. S. States Indus.*, 787 F.2d 1252, 1258 (8th Cir.1986)). I may not, however, "give [Gilster] 'the benefit of unreasonable inferences, or those at war with the undisputed facts.'" *Id.* (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651 (8th Cir.1989)).

Of particular note in employment discrimination cases, "when the parties have developed a full trial record, [the court is] not concerned with plaintiff's prima facie case. What is relevant, at this point, is simply whether the plaintiff's evidence permits a reasonable inference of discrimination or retaliation." *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003).

### a. Sufficiency of the Evidence—Sexual Harassment

To prevail on a claim of sexual harassment by a supervisor, a plaintiff must show that "(1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of her employment." *See Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1143 (8th Cir. 2007). There are two ways in which a plaintiff may demonstrate that the supervisor's harassment affected a term, condition, or privilege of her employment, *see Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004): a) the sexual harassment resulted in a "tangible employment action" against the plaintiff, meaning "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); or b) the sexual harassment was "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *accord Brenneman*, 507 F.3d at 1143. The difference between these two avenues for proving that a supervisor's sexual harassment "affected a term, condition, or privilege of . . . employment" is that, where the employer has taken no "tangible employment action," the employer may assert the *Ellerth/Faragher* affirmative defense to liability, which "consists of 'two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Weger v. City of Ladue*, 500 F.3d 710, 718 (8th Cir. 2007) (quoting *Williams v. Mo. Dep't of Mental*

*Health*, 407 F.3d 972, 976 (8th Cir. 2006), in turn quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)) (alteration omitted). Here, however, the defendants did not assert the *Ellerth/Faragher* defense "because there was no evidence plaintiff failed to take advantage of the Bank's internal policies." Defendants' Brief at 9 n.1 (docket no. 82-1). Because the *Ellerth/Faragher* defense was not at play in this case, Gilster could have established liability on her sexual harassment claim by proving either that Strub's harassment resulted in a tangible employment action—that is, a significant change in employment status—or that his harassment was sufficiently severe or pervasive to alter the conditions of Gilster's employment and create a hostile working environment.

Accordingly, I instructed the jury that, "To win on her claim of sexual harassment, Ms. Gilster must prove the following elements": "*One*, Ms. Gilster was subjected to sexually offensive remarks and behavior from Mr. Strub."; 2) "*Two*, such conduct was unwelcome."; 3) "*Three*, such conduct was based on Ms. Gilster's sex."; 4) "*Four*, such conduct *either* (a) caused a significant change in Ms. Gilster's employment status, *or* (b) was sufficiently severe or pervasive that Ms. Gilster did find, and a reasonable person in her position would have found, that her working environment was hostile." Jury Instructions at 8-9 (docket no. 66).

The defendants argue that the evidence adduced at trial was insufficient for the jury to find in favor of Gilster on her sexual harassment claim. The defendants do not contest that Gilster proved the first three elements, but the defendants maintain that Gilster's claim of sexual harassment fails as a matter of law because there was not sufficient evidence for the jury to find that Strub's harassment a) caused a significant change in Gilster's employment status or b) was sufficiently severe or pervasive for a reasonable person to find the environment hostile, though the defendants do not contest that Gilster herself found the environment hostile. The jury here found both that Strub's harassment caused

a significant change in Gilster's employment status and that Strub's harassment was sufficiently severe or pervasive for a reasonable person to find Gilster's work environment hostile. As explained above, however, because Gilster prevails on her claim if she proves either of these alternatives, I must deny the defendants' motion for judgment as a matter of law if I find, "viewing the evidence in the light most favorable to [Gilster]," that a "reasonable jury could have found," *see Heaton*, 534 F.3d at 887, *either* that Strub's harassment caused a significant change in Gilster's employment status *or* that Strub's harassment was sufficiently severe or pervasive for a reasonable person to find Gilster's work environment hostile.

I begin with whether the evidence was sufficient to demonstrate that Strub's harassment was sufficiently severe or pervasive for a reasonable person to find Gilster's work environment hostile. The question of whether a work "environment would reasonably be perceived . . . as hostile or abusive" "is not, and by its nature cannot be, a mathematically precise test." *See Harris*, 510 U.S. at 22. "There is no bright line between sexual harassment and merely unpleasant conduct . . . ." *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004) (quoting *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997)). Consequently, courts must examine "all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *accord Henthorn*, 359 F.3d at 1026. Although the factors identified in *Harris* "can be considered in deciding whether an environment is hostile, no single factor is required or determinative, and the relevancy and weight of any factor must be evaluated in light of all the facts of a specific case." *Hathaway*, 132 F.3d at 1221. When considering the total effect of multiple instances of harassing conduct, courts must

remember that "a work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." *Eich*, 350 F.3d at 759 (quoting *Hathaway*, 132 F.3d at 1222) (internal quotation marks and alteration omitted). Furthermore, the Eighth Circuit Court of Appeals has noted that "[o]nce there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." *See id.* at 761 (quoting *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)).

Gilster testified to the following instances of conduct and remarks that Strub directed at her, beginning in approximately summer 2008 and continuing until July 2009, when she complained to Primebank. Gilster stated that when she began working at Primebank, she respected Strub as a boss and mentor. Gilster and Strub previously worked together at another local bank, and Strub actually recruited Gilster to work at Primebank's new Sioux City location. However, Gilster first began to feel uneasy with Strub when, on several occasions, Strub asked her to go with him to meet a client outside the office, but, rather than meeting a client, Strub ran errands with Gilster in the car. Strub often complimented Gilster's physical appearance and, when she wore a dress or skirt, he would say "nice legs," carrying out the "i" in "nice." Gilster started wearing only pants to work to avoid these comments. Strub once put his arm around her and told her that they should "hook up." On one occasion, when Gilster asked Strub about a bonus, he told her—in the lobby of the bank and in front of her co-workers—to come into his office, take out her teeth (Gilster testified that she wears dentures), and shut the door, which Gilster understood to refer to oral sex. After that incident, on another occasion, when Strub told another female employee that the employee owed him a favor, the employee responded that her teeth would not come out, and Strub told Gilster that she would have to pay for the other employee. One morning, Strub approached Gilster while she was fixing breakfast

11

at the counter in the break room at work, placed his hands on the counter on either side of her, and leaned into her, with his pelvis touching her back side and his arms touching her arms. Another morning, Strub walked by Gilster's desk, picked up her orange juice, took a drink, and then dribbled it back out of his mouth into her cup. At a taping for a TV commercial for the bank, Strub told Gilster to bend down and show more bra to get more customers for the bank. He massaged her shoulders between five and ten times, and Gilster testified that Strub did so in an "intimate manner."

The defendants first argue that other witnesses did not corroborate Gilster's testimony and that Strub, during his testimony, denied all but the "denture comments" and a comment on Gilster's bra at the commercial shoot. The defendants further assert that, even accepting Gilster's testimony as true, the instances of Strub's conduct to which Gilster testified do not rise to the level of a hostile environment.

I reject the defendants' first argument regarding the lack of corroborating evidence for Gilster's testimony. At the judgment as a matter of law stage, I view the evidence in the light most favorable to Gilster and resolve factual conflicts in her favor. *See United Fire*, 419 F.3d at 746. Thus, where Gilster's and Strub's testimony conflicts, I accept Gilster's version of events. Unquestionably, the defense did an admirable job of mustering numerous witnesses and admissible evidence to refute Gilster's claims and evidence. Gilster also did a fine job in cross-examination to undermine this defense evidence. The jurors were extensively and properly instructed that they were the sole judges of the facts, and that they "may believe all of what any witness says, only part of it, or none of it." *See* Jury Instructions at 6 (docket no. 66).[5] This was a classic case in which the jury

_____

[5] At the end of Instruction No. 4 the jurors were also instructed: "It is your exclusive right to give any witness's testimony whatever weight you think it deserves . .

(continued...)

performed its historic function in deciding the credibility and believability of the witnesses and the evidence. I would dramatically undermine the historic function of the jury by setting aside its verdict for lack of corroborating evidence.

Moreover, I disagree with the defendants that a reasonable jury could not conclude, based on the evidence produced at trial, that a reasonable person would find Strub's harassment sufficiently severe or pervasive to create a hostile work environment. Strub "physically threaten[ed] [and] humilliat[ed]" Gilster when he caged her against the counter and pressed his groin into her back side. *See Harris*, 510 U.S. at 23. He touched her on a number of other occasions by massaging her and, in one instance, putting his arm around

---

[5](…continued)
. ." *See* Jury Instructions at 7. In discussing the burden of proof in this case, I instructed the jury:

> "Proof by the greater weight of the evidence" is proof that a fact is more likely true than not true.
> - It does not depend on which side presented the greater number of witnesses or exhibits
> - It requires you to consider all of the evidence and decide which evidence is more convincing or believable
>   - For example, you may choose to believe the testimony of one witness, if you find that witness to be convincing, even if a number of other witnesses contradict that witness's testimony
>   - You are free to disbelieve any testimony or other evidence that you do not find convincing or believable
> - If, on any issue in the case, you find that the evidence is equally balanced, then you cannot find that the issue has been proved

*Id.* at 3.

her. *See id.* (indicating that frequency of incidents is a factor for courts to consider in determining whether environment was hostile). His comments—made in front of Gilster's co-workers, no less—suggesting that Gilster remove her dentures and perform oral sex on him were graphic, intensely personal, and incredibly humiliating. Strub also requested a sexual relationship with Gilster by suggesting they "hook up." While Strub's frequent comments on Gilster's appearance may seem relatively minor in and of themselves, they become more significant and demonstrate a pattern of harassing behavior, when viewed in concert with Strub's unwanted physical contact and graphic references to oral sex. *See Eich*, 350 F.3d at 759 ("[A] work environment is shaped by the accumulation of abusive conduct . . . ."). Evaluating the numerous instances of harassing conduct and comments here, as a whole, I find that there is sufficient evidence for a reasonable jury to find, as the jury did here, that Strub's harassment was sufficiently severe or pervasive for a reasonable person to find Gilster's work environment hostile. *See id.* at 759 n.1 (collecting cases in which a combination of offensive physical contact, requests for sex, and sexual remarks constituted an actionable hostile environment).

Because I have determined that sufficient evidence was adduced at trial for a reasonable jury to determine that Strub's harassment was sufficiently severe or pervasive to amount to a hostile work environment, I need not reach the question of whether Strub's harassment caused a significant change in Gilster's employment status. I deny the defendants' motion for judgment as a matter of law as to Gilster's sexual harassment claim.

### b.    *Sufficiency of the Evidence—Retaliation*

To prevail on a claim of retaliation, a plaintiff must show that "(1) she engaged in protected conduct; (2) she suffered materially adverse employment action, action that would deter a reasonable employee from making a charge of employment discrimination or harassment; and (3) the materially adverse action was causally linked to the protected

conduct." *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077-78 (8th Cir. 2010). A materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted). The *White* Court explained that it defined a "materially adverse action" in intentionally broad terms "because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69. In other words, "[c]ontext matters." *Id.*

To establish a causal link between the protected conduct and the adverse action, "the plaintiff must show that the protected conduct was a 'determinative—not merely motivating—factor in the employer's adverse employment decision.'" *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 985 (8th Cir. 2011) (quoting *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008)). The Eighth Circuit Court of Appeals has recognized that "direct evidence establishing causation . . . is seldom available[,]" and plaintiffs, therefore, often must rely on "indirect evidence . . . establishing an inference of retaliatory animus." *See id.* at 986 (citation and internal quotation marks omitted). Temporal proximity between the protected activity and the adverse action may give rise to such an inference, but "[g]enerally, more than a temporal connection is required . . . ." *Id.* (citation and internal quotation marks omitted).

The jury found that both Strub and Primebank retaliated against Gilster. The defendants do not dispute that Gilster engaged in protected activity, but they argue that Gilster failed to establish a causal connection between her complaints and the alleged adverse employment actions. The defendants assert that Gilster relied almost exclusively on the timing of her protected activity, in relation to the adverse actions, to prove causation. The defendants maintain that too much time passed between Gilster's protected activity and the adverse actions to give rise to an inference of retaliation. Furthermore,

the defendants contend that the evidence shows that Primebank fired Gilster for legitimate, non-discriminatory reasons—namely, her poor behavior at work and suspicious activity on her personal checking account at Primebank.

Gilster made her initial internal complaint with Primebank regarding Strub's sexual harassment on July 2, 2009. President and CEO of Primebank, Matthew Ahlers, and Ann Schulz, Vice President and human resources officer for Primebank, met with Gilster and determined her complaint was founded. On July 6, 2009, Ahlers and Schulz met with Strub, reprimanded him, and required him to attend sexual harassment training. On July 21, 2009, Gilster e-mailed Ahlers and Schulz, both of whom worked at Primebank's Le Mars, Iowa, office, to inform them that Strub was avoiding her and giving work he previously would have assigned to her to other employees at the bank. *See* Gilster's Trial Ex. 15 (docket no. 69-11). Gilster remarked that Strub's behavior "fe[lt] like a slap in the face after being his assistant for a year and a half." *Id.* On March 10, 2010, Gilster e-mailed Ahlers and Schulz to report that Strub had informed her, before she complained about his harassment, that she could become a salaried employee. However, when she inquired in December 2009 about the promotion,[6] Strub told her that "it was against Primebanks [sic] policy" for her to be a salaried employee. *See* Gilster's Trial Ex. 20 (docket no. 69-16). When Schulz and Ahlers met with Strub on March 16, 2010, to discuss Gilster's March 10, 2010, e-mail, Schulz's event log indicates that Strub "was very frustrated this was coming up again" and that Strub stated he "felt like a whipped dog the last time, and I'm not going through it again." Joint Trial Ex. 2002 at 12 (docket no. 69-68).

---

[6] Gilster indicated that she sought a salaried position "so that I will have a consistent paycheck month to month. The way it stands hourly for me, my check differs by $100-$150 more or less month to month." Gilster's Trial Ex. 17 (docket no. 69-13).

Gilster filed her first complaint with the Iowa Civil Rights Commission (ICRC) on April 6, 2010. Primebank began monitoring Gilster's and Strub's work e-mail in April 2010 after receiving notice of Gilster's complaint from the ICRC. Primebank's legal counsel commenced an investigation of Gilster's claim, including interviewing all Primebank employees, other than Gilster. Ann Schulz's event log indicates that "bank counsel . . advised [employees] to alert Strub or Schulz, if any problems came up in the future regarding the Gilster situation." Joint Trial Ex. 2002 at 17 (docket no. 69-68). At trial, Gilster's counsel questioned Primebank employee Shelly Schlesser as to the precise "problems" employees were supposed to report:

> Q. And you were also told to forward e-mails or correspondence to Ann [Schulz] if you had issues with Mindy; right?
> A. Yes.
> Q. And they just wanted you forwarding any issues, any little mistake that you had; right?
> A. Right.
> . . . .
> Q. And let's be clear. You weren't instructed to send all e-mails between you and Mindy. You were just instructed to send e-mails that might show a problem with Mindy; correct?
> A. Yes.

Of note, when Primebank employee Lois Ohlendorf e-mailed Schulz about a mistake Gilster made on a loan, Schulz replied, "Thanks, Lois. I'll add this to my collection :)." Gilster's Trial Ex. 76 (docket no. 69-58).

Gilster filed this lawsuit on September 1, 2010. On December 27, 2010, Strub gave Gilster an "unsatisfactory" score on her annual performance review, and Primebank denied Gilster an annual pay raise in December 2010. Gilster filed a second complaint with the Iowa Civil Rights Commission on January 26, 2011. On February 3, 2011, Gilster

discovered Primebank was monitoring her e-mails. She became upset and announced her discovery to other employees at Primebank's Sioux City branch. There was conflicting testimony at trial about whether Gilster's announcement was disruptive and rude and whether she swore in front of other employees. On February 7, 2011, Schulz received notice of Gilster's second ICRC complaint. *See* Joint Trial Ex. 2002 at 35 (docket no. 69-68). Also on February 7, 2011, Schulz and Ahlers traveled to Primebank's Sioux City branch and issued Gilster a written warning, stating, "Your behavior on Thursday, February 3, 2011, was unacceptable. You were loud, rude, and disruptive." *See* Gilster's Trial Ex. 41 (docket no. 69-36). On February 8, 2011, Schulz and Ahlers learned that Gilster, following the written warning, sent text messages to other employees, asking if the other employees had told Schulz and Ahlers that she shouted and swore on February 3, 2011. Schulz and Ahlers believed Gilster's text messages "misrepresented" Gilster's discussion with Schulz and Ahlers regarding her "disruptive behavior" and that the text messages "denied Gilster's own misconduct." *See* Joint Trial Ex. 2002 at 36 (docket no. 69-68).

On February 10, 2011, Primebank terminated Gilster's employment. In the written letter of termination, signed by bank president Ahlers, Ahlers indicated that one of the reasons for Gilster's termination was her poor behavior, particularly the February 3, 2011, incident and the subsequent text messages. Ahler noted, "This behavior is representative of what we have been counseling you about for quite some time and is the type of behavior that contributed to your recent unfavorable employment evaluation." Gilster's Trial Ex. 45 (docket no. 69-39). As an additional reason for Gilster's termination, Ahlers cited suspicious transactions on Gilster's personal checking account at Primebank, including excessive overdrafts. *Id.*

I conclude, "viewing the evidence in the light most favorable to [Gilster]," that a "reasonable jury could have found," *see Heaton*, 534 F.3d at 887, that Strub and Primebank retaliated against Gilster because she complained about Strub's harassment and about retaliation against her. As to defendant Strub, a reasonable jury could find that several of Strub's actions towards Gilster constituted materially adverse employment actions and were motivated by retaliatory animus. Strub gave Gilster an unsatisfactory performance evaluation at her annual review in December 2010. *See* Gilster's Trial Ex. 30 (docket no. 69-25). The Eighth Circuit Court of Appeals "has often held '[a]n unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" *Higgins v. Gonzales*, 481 F.3d 578, 586 (8th Cir. 2007) (quoting *Turner v. Gonzales*, 421 F.3d 688, 696 (8th Cir. 2005)), *abrogated on other grounds*, *Torgerson v. City of Rochester*, 643 F.3d 1031, 1058 (8th Cir. 2011). That precise situation occurred here, as Primebank cited Strub's unfavorable evaluation as a reason for terminating Gilster in February 2011. *See* Gilster's Trial Ex. 45 (docket no. 69-39). Thus, Strub's unsatisfactory evaluation constituted a materially adverse action against Gilster. A reasonable jury could have inferred that retaliatory animus motivated Strub's review: for one, the timing of the evaluation suggests a causal connection between Gilster's protected activity and the poor evaluation. Gilster filed her complaint with the ICRC in April 2010 and filed this case in September 2010—then, at her annual review in December, the next available opportunity for Strub to review her, she received an unsatisfactory evaluation. Furthermore, Strub's attitude in March 2010, after he learned of Gilster's complaining e-mail, suggests retaliatory animus, as he "was very frustrated this was coming up again" and stated he "felt like a whipped dog the last time, and I'm not going through it again."

Joint Trial Ex. 2002 at 12 (docket no. 69-68). The jury could have reasonably inferred that Strub was tired of Gilster's complaints and, accordingly, retaliated against her.

Additionally, Strub's refusal to consider Gilster for a salaried position in December 2009 after she complained of sexual harassment also constitutes a materially adverse action. *See White*, 548 U.S. at 64 (noting that Title VII's antiretaliation provision "is not limited to," but includes, "discriminatory actions that affect the terms and conditions of employment" such as "failing to promote" or "a significant change in benefits" (internal quotation marks omitted)). Of course, where "there [is] no promotional opportunity available . . . , no reasonable employee would . . . f[i]nd [an employer's] failure to promote . . . to be materially adverse." *See Moore v. Forrest City Sch. Dist.*, 524 F.3d 879, 885 (8th Cir. 2008). Gilster testified that, before she complained of harassment, Strub indicated that she could become a salaried employee. Bank president Ahlers and vice president Schulz testified that Gilster was never eligible to become salaried, but Strub admitted at trial that he previously told Gilster it was a "possibility" that she could become salaried. Viewing the facts in the light most favorable to Gilster, a reasonable jury could have inferred that when Gilster inquired about a salaried position in December 2009, and Strub informed her that such a position was not possible, he did so to retaliate against Gilster for her complaints of harassment and retaliation against him in July 2009.

As to defendant Primebank, a reasonable jury could have found that Primebank terminated Gilster in retaliation for her complaints of sexual harassment and retaliation. The defendants are certainly correct that the temporal proximity of Gilster's first complaint with the ICRC in April 2010, and the filing of this case in September 2010, in relation to her termination on February 10, 2011, does not give rise to a strong inference of retaliation. Importantly, however, as Gilster points out, Primebank received notice on February 7, 2011, of Gilster's second ICRC complaint, which alleged additional incidents

of retaliation, and, only four days later, Primebank terminated her employment. The close temporal proximity, a mere four days, between Gilster's second ICRC complaint and the defendants' termination of her employment gives rise to an inference of retaliatory animus. *See Tyler*, 628 F.3d at 986 (noting that timing may give rise to inference of retaliation).

Furthermore, Gilster's theory of causation at trial did not hinge on temporal proximity alone. Gilster showed that the defendants, after they learned of Gilster's first ICRC complaint, began monitoring Gilster and requested that other employees report any mistakes Gilster made on the job. A reasonable inference may be drawn, from Primebank's Orwellian monitoring of Gilster and from Schulz's "collection" of Gilster's "problems," that the defendants were looking for a reason to fire Gilster because they were tired of her complaints of retaliation.

Moreover, Gilster produced strong evidence to rebut the defendants' preferred legitimate, nondiscriminatory reasons for terminating her employment. As to the defendants' argument that they terminated Gilster for poor, disruptive behavior, Gilster produced evidence that, in the two years she worked at Primebank before she filed her ICRC complaints and this federal case, she received favorable employee evaluations. *See* Gilster's Trial Exs. 1, 18 (docket no. 69-1, 69-14). Regarding the defendants' argument that they fired Gilster for suspicious activity on her personal checking account, including overdrafts, Gilster showed that other employees with account overdrafts had not been terminated. The defendants produced evidence that they reported Gilster to law enforcement for the crime of "check kiting" on her Primebank account, but Gilster showed that she had never been charged with any offense arising from checking activity at Primebank. The jury could reasonably infer, from Gilster's evidence rebutting the defendants' alleged reasons for terminating Gilster, that the defendants' preferred explanations were, in fact, pretext for the real reason: they fired her in retaliation for her

complaints of sexual harassment and retaliation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.").

Sufficient evidence existed for the jury to find in Gilster's favor on her retaliation claim. Therefore, I deny the defendants' motion for judgment as a matter of law on both Gilster's sexual harassment and retaliation claims.[7]

## 2. *Judgment as a Matter of Law and Remittitur on Damages*

### a. *Punitive Damages*

The defendants renew their motion for judgment as a matter of law as to punitive damages and, in the alternative, move for remittittur of Gilster's punitive damages based on Title VII's statutory cap on damages for employers of Primebank's size. Gilster sought

---

[7] The defendants' brief is unclear as to whether, in the alternative to their motion for judgment as a matter of law based on sufficiency of the evidence, they move for a new trial on the ground that the verdict was against the great weight of the evidence. At the beginning of their brief, in the legal standards section, the defendants quote cases explaining that a new trial is warranted under Rule 59 when the jury's verdict is against the weight of the evidence. *See* Defendants' Brief at 7 (docket no. 82-1). However, in their argument section, when the defendants discuss the insufficiency of the evidence to support the jury's verdict on Gilster's sexual harassment and retaliation claims, the defendants only move for judgment as a matter of law, not for a new trial. *See id.* at 13, 19. Even if the defendants had clearly argued that a new trial was warranted because the jury's verdict was against the weight of the evidence, I find, on my independent review of the evidence, *see Frumkin v. Mayo Clinic*, 965 F.2d 620, 624 (8th Cir. 1992) (explaining that, in considering motion for new trial, "[t]he district court is free to weigh the evidence and disbelieve witnesses, and may grant a new trial even where there is substantial evidence to sustain the verdict." (internal quotation marks and alterations omitted)), that the jury's verdict in Gilster's favor on her sexual harassment and retaliation claims was not "against the 'great,' 'clear,' or 'overwhelming' weight of the evidence." *See id.*

punitive damages pursuant to Title VII only, as punitive damages are not available under the ICRA. *See Baker v. John Morrell & Co.*, 382 F.3d 816, 827 (8th Cir. 2004). The jury awarded Gilster $200,000 in punitive damages against Primebank on Gilster's sexual harassment claim and $400,000 in punitive damages against Primebank on Gilster's retaliation claim. The defendants maintain that the evidence at trial was insufficient to support the jury's punitive damages awards.

Punitive damages are appropriate in a Title VII case if the plaintiff shows that the employer, in intentionally discriminating against the plaintiff, acted with "malice," meaning evil motive or intent, or with "reckless indifference to the federally protected rights of [the plaintiff]." 42 U.S.C. § 1981a(b)(1); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999); *accord Dominic v. DeVilbiss Air Power Co.*, 493 F.3d 968, 974 (8th Cir. 2007); *see also Quigley v. Winter*, 598 F.3d 938, 952-53 (8th Cir. 2010) ("Punitive damages are appropriate in a federal civil rights action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." (citations and internal quotation marks omitted)). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 536; *accord Dominic*, 493 F.3d at 974. To support an award of punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad*, 527 U.S. at 536. "The malice or reckless indifference of employees serving in a managerial capacity and acting within the scope of their employment may be imputed to the employer." *E.E.O.C. v. Siouxland Oral Maxillofacial Surgery Assocs., L.L.P.*, 578 F.3d 921, 925 (8th Cir. 2009).

I first address the jury's punitive damage award on Gilster's retaliation claim. Primebank maintains that there was insufficient evidence at trial to show that bank president Matthew Ahlers acted with malice or reckless indifference to Gilster's federally protected rights when he terminated Gilster. Again, in determining whether sufficient evidence existed to support an award of punitive damages, I view the facts and draw all reasonable inferences in Gilster's favor. At trial, Gilster's counsel questioned Matthew Ahlers about whether he knew retaliation was illegal: "Are you aware that firing Ms. Gilster for making good-faith complaints about sexual harassment and retaliation is against the law?" Ahlers responded, "Yes." Transcript of Ahlers's Testimony at 113:1-4 (docket no. 63). The Eighth Circuit Court of Appeals, reversing a district court's grant of judgment as a matter of law in favor of an employer on punitive damages in a pregnancy discrimination case, explained that, where a managing employee "testified that she knew that discrimination on the basis of pregnancy was illegal[,] [f]rom this evidence, a reasonable jury could infer that [the managing employee] knew that she may be violating federal law by considering pregnancy as a factor in rejecting [plaintiff's] application for employment." *Siouxland*, 578 F.3d at 926. Thus, judgment as a matter of law on punitive damages, in favor of the employer, is not appropriate where "evidence was presented to the jury that a managerial employee engaged in discrimination while knowing that federal law prohibited such discrimination." *See id.* Here, Ahlers testified that he knew retaliation for complaints of sexual harassment or retaliation violated the law. A reasonable jury could infer from this evidence that Ahlers knew that he may have been violating federal law by firing Gilster in retaliation for her protected activity. Furthermore, Primebank does not appear to dispute that Ahlers, as Primebank's president and CEO, served in a "managerial capacity" and "act[ed] within the scope of [his] employment" when he fired Gilster. *See id.* at 925-26 (finding that managing partner who

fired employee was "indisputably a managerial employee acting within the scope of his employment"). Therefore, there is sufficient evidence to support the jury's award of punitive damages against Primebank on Gilster's retaliation claim.

I need not reach the question of whether punitive damages are appropriate on Gilster's sexual harassment claim because she cannot recover those damages, in any event, due to Title VII's damages cap. Both parties agree that Gilster's total punitive damages recovery should be capped at $50,000. Under Title VII, because Primebank has seventy-one employees, Gilster may recover a maximum total of $50,000 in both compensatory damages, excluding back pay, and punitive damages for her Title VII sexual harassment and retaliation claims. *See* 42 U.S.C. § 1981a(b)(3)(A); *Baker*, 382 F.3d at 827; *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 264 (5th Cir. 2011) ("Title VII's damages cap applies to each party in an action, not to each claim."). While Title VII caps both compensatory and punitive damages, the ICRA, though it does not permit punitive damages, "does not include a cap for compensatory damages." *Baker*, 382 F.3d at 827. The defendants do not dispute that I may allocate Gilster's compensatory damages to her ICRA claims and her punitive damages to her Title VII claims, thereby maximizing her recovery. *See* Defendant's Brief at 26 (docket no. 82-1) ("Thus, (assuming that the emotional distress recovery is ultimately awarded under the state statutory claim), the most that plaintiff can recover for punitive damages is $50,000.00."). Thus, Gilster may recover $50,000 in punitive damages under Title VII for both her sexual harassment and retaliation claims. Because I have determined that sufficient evidence existed to support the jury's award of punitive damages on Gilster's retaliation claim, and those punitive damages far exceed the $50,000 maximum that Gilster may recover, I need not reach the question of whether punitive damages were appropriate on Gilster's sexual harassment claim. Therefore, I deny the defendant's motion for judgment as a matter of law as to

punitive damages, but I grant the defendant's motion for remittitur and reduce Gilster's punitive damages award to $50,000. I allocate Gilster's punitive damages to her Title VII claims and her compensatory damages to her ICRA claims.

### b.  *Emotional Distress Damages*

The defendants also move for judgment as a matter of law as to future emotional distress damages, arguing that there was insufficient evidence for a reasonable jury to award Gilster any future emotional distress damages. Additionally, and in the alternative, the defendants argue that Gilster's past and future emotional distress damages are excessive and move for remittitur of these damages.

"A plaintiff is entitled to damages for emotional distress when there is evidence of actual emotional distress caused by an employer's discriminatory acts . . . ." *See Christensen v. Titan Distribution, Inc.*, 481 F.3d 1085, 1096 (8th Cir. 2007). The Eighth Circuit Court of Appeals has repeatedly held that, "to support a claim for emotional distress, the claim 'must be supported by competent evidence of genuine injury.'" *Heaton*, 534 F.3d at 891 (quoting *Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527, 531 (8th Cir. 1999). "A plaintiff's own testimony can be sufficient for a finding of emotional distress, and medical evidence is not necessary[,]" though "[t]he plaintiff's testimony must offer specific facts as to the nature of his claimed emotional distress and the causal connection to [the employer's] alleged violations." *Christensen*, 481 F.3d at 1097 (citation and internal quotation marks omitted).

Gilster testified that her job at Primebank, before the sexual harassment and retaliation began, gave her a great sense of self-worth and satisfaction. Gilster explained that Strub's sexual harassment made her feel humiliated and degraded. She stated that Strub's sexual harassment brought up memories from her childhood, when her uncle sexually abused her. Gilster testified that she became anxious and depressed, and she

sought medical help from Elizabeth Pratt, an advanced registered nurse practitioner, beginning in August 2008. Pratt prescribed her medicine for anxiety and depression, which Gilster continues to take. Gilster gained approximately thirty pounds between July 2009 and July 2010. Gilster testified that Strub and Primebank's retaliation made her feel embarrassed, alienated, and extremely stressed after she lost her job. After she was fired, she began to drink heavily and cut herself. Though she testified that she has since stopped drinking, she explained that she still cuts herself. She testified that she does not anticipate that she will be able to go off her medication in the near future. She also testified that she expects she will suffer emotional distress for the rest of her life due to the sexual harassment and retaliation she experienced at Primebank. Elizabeth Pratt, who treated Gilster for anxiety and depression, testified that, based on her treatment of Gilster, she believed Gilster would continue to suffer in the future from anxiety and depression.[8]

---

[8] The defendants also maintain that I erred when I permitted Elizabeth Pratt to offer expert opinion testimony on whether Gilster would experience anxiety and stress in the future because Gilster failed to disclose Pratt's expert opinion on this subject.

Where a party fails to comply with discovery disclosure requirements, "[t]he district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). Because Pratt was a treating practitioner and not an expert specifically retained for trial, Gilster, to comply with disclosure requirements, was required to provide "the subject matter on which [Pratt] [was] expected to present evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which [Pratt] [was] expected to testify." FED. R. CIV. P. 26(a)(2)(C). Gilster's expert designation of Pratt was, as follows:

    1) Elizabeth Pratt, ARNP, Family Healthcare of Siouxland

    . . . .

    a.    Elizabeth Pratt treated Plaintiff throughout her anxiety and depression.

    b.    Plaintiff visited Ms. Pratt approximately 10 times from

(continued...)

> January 2010 to January 2011. Ms. Pratt's testimony
> will likely relate to Plaintiff's medical records, her
> treatment of her, and the effects of Defendants' actions
> on Plaintiff.

Gilster's Expert Designation at 1 (docket no. 82-3). The defendants maintain that Gilster's disclosure was insufficient to put them on notice that Pratt would testify to future emotional harm. I disagree. Gilster indicated that Pratt would testify to "the effects of Defendants' actions on Plaintiff," and I find that this summary of Pratt's opinions was sufficient under Rule 26(a)(2)(C). The defendants knew from Gilster's complaint that she sought future damages for emotional distress. *See* Gilster's Second Amended Complaint at 9-10 (docket no. 22). There was no unfair surprise to the defendants in letting Pratt testify to her opinion of whether Gilster would suffer future anxiety and depression as a result of the defendants' actions, as this falls within the category of "the effects of Defendants' actions on Plaintiff." Therefore, there was no discovery violation and exclusion of Pratt's expert opinion testimony was not warranted.

The defendants raise the argument, in their reply brief, that "[a] nurse is not qualified to offer her opinion concerning causation or the need for future care." Defendants' Reply at 3 (docket no. 100). An argument not raised until a reply brief is waived. *See, e.g.*, *Armstrong v. Am. Pallet Leasing, Inc.*, 678 F. Supp. 2d 827, 872 n. 19 (N.D. Iowa 2009) (noting that inclusion of a new argument in a reply is contrary to N.D. Iowa L.R. 7.1(g) and practice in this circuit, citing cases). Even if the defendants had not waived this argument, I disagree that Pratt, as an advanced registered nurse practitioner, is unqualified to offer her opinion as to the need for future care. She testified that she pursued an "advanced [degree] three years past undergraduate in nursing" and that she is "able to formulate a medical diagnosis, prescribe medication." Transcript of Elizabeth Pratt's testimony at 3:2-6 (docket no. 85). The defendants do not actually criticize Pratt's specific qualifications but, instead, make a blanket statement that nurses are never qualified to offer an opinion as to the need for future care. Rule 702's requirements for expert testimony do not rise and fall with the proffered expert's title, but instead require the court to look at the expert's actual qualifications to offer opinions on a particular issue in a particular case. *See* FED. R. EVID. 702; *Lujano v. Town of Cicero*, No. 07 C 4822, 2011 WL 6097719, at *2 (N.D. Ill. Dec. 6, 2011) ("[N]urses, midwives, and other health care professionals can give expert testimony if they meet the standards for

(continued...)

Gilster's husband, Brent, testified that Strub's harassment reminded Gilster of the sexual abuse that she suffered in her youth, and that she became distant and found it hard to be intimate with her husband after Strub sexually harassed her. He explained that Gilster took immense pride in her job in the banking industry and that her self-worth plummeted when she lost her job at Primebank. He stated that he thought Gilster would, in the future, continue to feel the emotional effects of the harassment and retaliation, and he did not think Gilster would be able to go off her medications any time soon, as he feared she would turn back to alcohol if she did.

First, as to whether sufficient evidence existed for a reasonable jury to award Gilster future emotional distress damages, I find that the testimony of Gilster, her husband, and Nurse Practitioner Pratt, all of whom testified about "specific facts as to the nature of [Gilster's] claimed emotional distress and the causal connection to [Strub and Primebank's] alleged violations," *see Christensen*, 481 F.3d at 1097, was more than sufficient to provide "competent evidence of genuine injury" in the future, *see Heaton*, 534 F.3d at 891; *accord O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1257 (10th Cir. 2001) (concluding, in race discrimination and retaliation case, that testimony of plaintiff and his wife "enabled the jury to reasonably determine that Mr. O'Neal would suffer future emotional distress," where plaintiff testified about "inability to sleep and loss of appetite" and plaintiff's wife "corroborated [plaintiff's] statements, testifying that [plaintiff's] condition had gotten worse since his termination" and that he was "more worried and very unhappy"). Thus,

---

[8](...continued)
doing so under Rule 702."). I do not see, and the defendants do not raise, anything specifically lacking in Pratt's knowledge, experience, and training that rendered her unqualified to offer expert testimony on Gilster's need for future care.

Therefore, I did not err by permitting Pratt to testify as an expert.

I deny the defendants' motion for judgment as a matter of law as to future emotional distress damages.

Second, I address whether the jury's awards of past and future emotional distress damages were excessive. "[A] district court should order remittitur only when the verdict is so grossly excessive as to shock the conscience of the court. A verdict is not considered excessive unless there is 'plain injustice' or a 'monstrous' or 'shocking' result." *Eich*, 350 F.3d at 763 (citations and some internal quotation marks omitted). Specifically, "[a]wards for pain and suffering are highly subjective and the assessment of damages is within the sound discretion of the jury, especially when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms." *Christensen*, 481 F.3d at 1097 (citation and internal quotation marks omitted). On Gilster's sexual harassment claim, the jury awarded $20,000 for past emotional distress and $60,000 for future emotional distress. On her retaliation claim, the jury awarded $20,000 for past emotional distress and $140,000 for future emotional distress. The defendants argue that "th[e] record does not establish the existence of a genuine injury[,]" Defendants' Brief at 35 (docket no. 82-1), and they urge that the medical records do not corroborate the extent of the anxiety and depression to which Gilster testified.

I disagree. Gilster presented evidence of genuine injury through her own testimony, her husband, and Nurse Practitioner Pratt. Their testimony indicated that Gilster suffered and will continue to suffer anxiety and depression, as a result of the sexual harassment and retaliation she experienced. She takes medicine for anxiety and depression. Strub humiliated and degraded Gilster, often in front of her co-workers. Strub's harassment recalled painful memories from Gilster's childhood. Gilster gained a significant amount of weight during the time that Strub and Primebank retaliated against her. After she was fired, she developed a drinking problem and began cutting herself. She lost her sense of

self-worth. The evidence here is certainly sufficient to establish "genuine injury" as a result of sexual harassment and retaliation. I reject the defendants' argument that I must reduce Gilster's damages because the medical records did not corroborate the extent of emotional distress to which she and other witnesses testified. For one, "medical evidence is not necessary" to support an award of emotional distress damages, *see Christensen*, 481 F.3d at 1097, though, of course, Gilster presented medical evidence in the form of Nurse Practitioner Pratt's testimony. Furthermore, it was the jury's role to reconcile the evidence in this case, and I do not disturb the jury's conclusions where, as here, there was sufficient evidence from Gilster, her husband, and Nurse Practitioner Pratt for the jury to issue the emotional distress awards it did.

Given the evidence at trial, the jury's award of $80,000 in emotional distress damages for sexual harassment and $160,000 for retaliation does not "shock the conscience of the court." *See Eich*, 350 F.3d at 763. The cold record does not adequately reflect the devastating loss of self-esteem and self-worth that Gilster felt, as a result of the sexual harassment and retaliation she suffered. In Circuit Judge Donald Lay's powerful words, sexual harassment "destroy[s] the human psyche as well as the human spirit." *See Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1304 (8th Cir. 1997). Furthermore, I was not at all surprised that the jury awarded significantly higher emotional distress damages on Gilster's retaliation claim than her sexual harassment claim. Gilster had enormous self-esteem wrapped up in her dream position as a bank credit administrator. The jury could have easily determined, on the evidence presented here, that Primebank's illegal retaliatory termination created an unbounded wellspring of emotional distress that dramatically crushed Gilster's personal and emotional sense of well-being and self-worth. World-renowned American psychologist Abraham Maslow wrote, "Healthy self-esteem is based not only upon approval from others, but also upon actual achievements and

successes and upon the realistic self-confidence which ensues." ABRAHAM H. MASLOW, TOWARD A PSYCHOLOGY OF BEING 221 (3d ed. 1999). The defendants, by illegally discharging Gilster, cruelly deprived her not only of the approval that comes with doing one's job well, but also of the opportunity for personal achievement and success—so essential to a positive view of one's self-worth.

Additionally, although comparisons to other cases are, ultimately, of limited use because every case is different, I note that the jury's awards here, given the evidence of Gilster's anxiety and depression, are not outside the heartland of awards the Eighth Circuit Court of Appeals has affirmed in other discrimination cases. *See Eich*, 350 F.3d at 763 (collecting cases). I find that the jury's total award of emotional distress damages of $240,000 was well "within [its] sound discretion," *see Christensen*, 482 F.3d at 1097, and certainly is not "grossly excessive," *see Eich*, 350 F.3d at 763. Thus, I deny the defendants' motion for remitittur on Gilster's emotional distress damages.

### c. *Back Pay and Medical Expenses*

The defendants also move for remittitur on Gilster's back pay and medical expenses. The jury awarded Gilster back pay and medical expenses twice, once on her sexual harassment claim and once on her retaliation claim. The parties agree, as do I, that Gilster should recover only once for back pay and medical expenses. Therefore, I reduce Gilster's back pay to $28,820.12 and her past medical expenses to $1,330.49.

The parties dispute, however, whether the entire amount of the back pay award is recoverable. Gilster requested, and the jury awarded, $28,820.12 in back pay, a sum that included paid sick leave, paid vacation, and paid holidays. Gilster's Trial Ex. 54 (docket no. 69-46). The defendants argue that permitting Gilster to recover for sick days, paid vacation, and paid holidays is double compensation, as these days have no monetary value and because Gilster "always used all of her sick days [and vacation]." I disagree. Back

pay must be "fashion[ed] . . . in order to make the Title VII victim whole." *See E.E.O.C. v. Dial Corp.*, 469 F.3d 735, 743 (8th Cir. 2006) (citation and internal quotation marks omitted). As a Primebank employee, Gilster received not just her wages, but also vacation, sick leave, and holidays. The defendants' retaliation deprived her of these benefits. To approach the goal of making Gilster whole—to the extent this can be accomplished through monetary damages—she should recover the value of these days as part of her back pay. *See Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1062 (8th Cir. 2002) (ADEA case affirming back pay award that included vacation days); *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 626 (6th Cir. 1983) (Title VII case considering appropriate back pay and concluding, "Sick leave, vacation pay, pension benefits and other fringe benefits the claimant would have received but for discrimination should also be awarded."). The defendants, other than arguing that sick days, vacation, and holidays have no value, do not object to the way in which Gilster calculated the value of the sick days, vacation, and holidays, and I note that Gilster appropriately subtracted the value of any leave and holidays at her new job from the back pay she sought from Primebank. *See Dial*, 469 F.3d at 744 ("[T]he well established rule for calculating back pay [is] the difference between the amount the claimant would have earned absent the discrimination and the amount of wages actually earned during the relevant period."). Therefore, I deny the defendants' request to deduct from Gilster's back pay award the value of sick days, vacation, and holidays.

The defendants also assert that Gilster's back pay should be reduced, based on their "after acquired evidence" defense. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362 (1995) (explaining that "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information . . . ." and holding that an employee's back pay, in such

circumstances, "should be calculat[ed] . . . from the date of the unlawful discharge to the date the new information was discovered"). The defendants asserted at trial that they would have fired Gilster anyway in September 2011, when they discovered that she was using her work e-mail to contact her attorneys to build this case.[9] Thus, the defendants argued that Gilster's back pay recovery should be limited to the period from February 10, 2011, the date of Gilster's termination, to September 2011, when they would have, allegedly, terminated her employment anyway. The jury rejected this defense at trial, but the defendants contend that the evidence that they would have fired Gilster in September 2011 was "unrebutted." Contrary to the defendants' assertions, however, Gilster produced ample evidence that other Primebank employees used work e-mail for personal purposes and were never fired as a result. Anticipating this response, the defendants urge that Gilster's "[c]ounsel was able to confuse the issue by offering evidence that other employees used Bank computers to send personal email. This was never the point of the defendants' defense." Defendants' Brief at 36 n.19 (docket no. 82-1). It was the defendants' burden, not Gilster's, to elucidate the "point" of their own defense. There was sufficient evidence for a reasonable jury to reject the defendants' defense, and I, therefore, deny the defendants' motion to reduce Gilster's back pay on this basis.

### 3. New Trial

The defendants move for a new trial based on certain statements in Gilster's rebuttal closing argument that, the defendants argue, were so prejudicial as to require a new trial. Federal Rule of Civil Procedure 59(a) provides: "The court may, on motion, grant a new

---

[9] The parties dispute whether sending e-mail to one's attorneys, to build an employment discrimination case, constitutes protected activity under the retaliation provisions of Title VII and the ICRA. I see no need to resolve their dispute at this juncture, as the jury rejected the defendants' defense.

trial on all or some of the issues—and to any party—. . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." FED. R. CIV. P. 59(a)(1)(A). "A new trial should be granted where the improper conduct of counsel in closing argument causes prejudice to the opposing party and unfairly influences a jury's verdict." *Campos v. City of Blue Springs, Mo.*, 289 F.3d 546, 552 (8th Cir. 2002) (citation and internal quotation marks omitted). Where a party failed to object to a statement in closing argument at trial, courts review only for plain error, meaning that a new trial is warranted "only in extraordinary situations, when the error is so prejudicial as to cause a miscarriage of justice." *See Manning v. Lunda Constr. Co.*, 953 F.2d 1090, 1092-93 (8th Cir. 1992) (citation, internal quotation marks, and alteration omitted). Where a party did object to statements in closing argument, a new trial is required if the statements were "not only . . . plainly unwarranted but also clearly injurious." *City of Malden, Mo. v. Union Elec. Co.*, 887 F.2d 157, 164 (8th Cir. 1989). Importantly, the defendants, as the complaining party, "bear[] the burden of making a concrete showing of prejudice." *Id.* "'[I]mproper comments during closing arguments rarely rise to the level of reversible error.'" *Christmas v. City of Chicago*, 682 F.3d 632, 642 (7th Cir. 2012) (quoting *Valbert v. Pass*, 866 F.2d 237, 241 (7th Cir. 1989)). The Eighth Circuit Court of Appeals has admonished,

> Courts should exercise great caution in setting aside judgments because of inadvertent remarks made by litigants or counsel during a hotly contested trial, even though improper, unless it clearly appears that they aroused the sympathy or prejudice of the jury and influenced the verdict.

*Harris v. Zurich Ins. Co.*, 527 F.2d 528, 531 (8th Cir. 1975) (quoting *Chi. & N.W. Ry. Co. v. Kelly*, 74 F.2d 31, 35 (8th Cir. 1934)).

The law regarding proper subject matter for closing arguments is nebulous and open to a variety of interpretations.[10] District courts have "broad discretion to oversee closing argument" and to determine when counsel have overstepped the bounds of proper content. *See Harris v. Pac. Floor Mach. Mfg. Co.*, 856 F.2d 64, 68 (8th Cir. 1988). As a general rule, "counsel's argument must be limited by the evidence and law pertinent to the issues in the case." *Wilfing v. Gen. Motors Corp.*, 685 F.2d 1049, 1052 (8th Cir. 1982). It is improper for counsel to "argue facts not in evidence." *See United States v. Vazquez-Garcia*, 340 F.3d 632, 641 (8th Cir. 2003). Likewise, "[e]xcept to the extent counsel bases any opinion on the evidence in the case, counsel may not express his or her personal opinion on the merits of the case or the credibility of witnesses." *United States v. Segal*, 649 F.2d 599, 604 (8th Cir. 1981) (quoting *United States v. Garza*, 608 F.2d 659 (5th Cir. 1979)) (alterations omitted). As the defendants note, Iowa Rule of Professional Conduct 32:3.4, Fairness to Opposing Party and Counsel, provides:

> A lawyer shall not . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused . . . .

Iowa R. Prof'l Conduct 32:3.4(e). As to closing argument, however, no court or lawyer could interpret *literally* the ethical rules' prohibition on "allud[ing] to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by

---

[10] I requested supplemental briefing from the parties on two issues: first, the extent to which counsel can share personal stories in closing argument; and second, whether prejudice from any improper remarks in closing argument should be aggregated. I have considered the parties' submissions on these issues.

admissible evidence" because it is axiomatic that lawyers in civil cases may use metaphor, anecdotes, or allusions to aid in their summation of the evidence. *See Harris*, 856 F.2d at 68 (approving counsel's use of Ann Landers column in closing and noting, "There is nothing improper in a civil case with a lawyer's citing widely recognized authorities during a closing statement (though Shakespeare and the Bible come more readily to mind than Ann Landers); on the contrary, this is sometimes an effective, and certainly a time-honored method of argument. . . .The letter was only a general observation on human behavior, not a comment on the particular facts of this case."). The rub, of course, is to determine when lawyers have crossed the line from permissible anecdotes and analogies, meant to aid in their presentation of the evidence, into the dangerous and prejudicial territory of suggesting to the jury that it should decide the case on something other than the evidence before it.

The defendants direct me to a number of comments made by Gilster's counsel in her rebuttal closing argument. I first review the one portion of Gilster's rebuttal closing argument to which the defendants did object, keeping mind that these remarks require a new trial only if they were "plainly unwarranted [and] clearly injurious," *see City of Malden*, 887 F.2d at 164:

> [MS. TIMMER:] Mindy Gilster had the strength to make that complaint back on July 2, 2009. I sure didn't. Back in 2006 I was sexually harassed by a professor at Drake, but I was on my way out. I was a third-year law student, and I had been a student bar association president for the last year, and I was well respected and liked by my peers. I had a great relationship with the dean of the law school because of my role as president. But I refused to be that --
>
> MR. PHILLIPS: Excuse me, counsel. Your honor, I do not think this is appropriate for argument.
>
> THE COURT: Overruled.

MS. TIMMER: And I refused to stand up for myself. It takes great strength and fearlessness to make a complaint against your supervisor.

Given my calling as a civil rights lawyer, I am constantly amazed by the strength and courage that my clients have when facing their employers and supervisors, the people who hold all the power. It is my sincere hope that one day my daughter, my friends, my sisters will live in a community where they will not be silenced by fear. And you can ensure this happens with your verdict.

I am fortunate that in the course of my life and in my work I've had the opportunity to represent these women who are so strong to make these complaints. I'm fortunate in my life that for the last two years I've had the honor of representing Miss Mindy Gilster and that I got to try this case.

Transcript of Rebuttal Closing Argument at 16:9-17:9 (docket no. 82-4).

The defendants argue that, in referring to her own experiences with sexual harassment, Gilster's counsel improperly validated and vouched for the credibility of Gilster's claims of sexual harassment and retaliation.[11]  I disagree.  These comments say

_____

[11] The defendants liken Gilster's rebuttal argument to *People v. Hayes*, 539 N.E.2d 355 (Ill. App. Ct. 1989), a case in which the defendant was charged with sexually assaulting a woman on her way to the gas station for cigarettes, and the prosecutor told the jury, during closing argument, that she, too, had been followed by a man on her way to the gas station for cigarettes. *Id.* at 357-58.  The Illinois Court of Appeals, reversing the defendant's conviction and ordering a new trial, concluded that the prosecutor "improperly bolstered the victim's credibility and improperly appealed to the jury's passions and prejudices" by "strongly impl[ying] that the victim's testimony should be believed because the prosecutor too had faced a dangerous neighborhood on a late night, a short trek for cigarettes, and the fear of being attacked by a man chasing her." *Id.* at 358.

Here, unlike the prosecutor in *Hayes*, who bolstered the victim's entire version of events, Gilster's counsel stressed the undisputed fact that Gilster had made a complaint of sexual harassment.  Moreover, in contrast to Gilster's counsel, the prosecutor in *Hayes*

(continued...)

nothing about whether Gilster's claims are true. Rather, as I understood the argument, and as I believe a reasonable juror would understand it, Gilster's counsel meant to convey the difficulty of making a complaint of sexual harassment. Gilster's counsel, arguing by analogy to her own life, emphasized evidence already in the record. Gilster had, in fact, complained about sexual harassment, both at Primebank and with the ICRC. Both Gilster and her husband Brent testified that Gilster was reluctant to report Strub's harassment because she feared that she would face retaliation, from which a reasonable jury could infer that Gilster was all the more devastated when Primebank and Strub did, in fact, retaliate against her. Nevertheless, while the thrust of Gilster's counsel's argument—that making a complaint of sexual harassment is very difficult—was entirely permissible, she likely crossed the line of proper closing argument, given the extent to which she offered her own experiences to prove the difficulty of making a claim of sexual harassment. *Segal*, 649 F.2d at 604 (noting that closing argument "is not for the purpose of permitting counsel to testify as an expert witness"). Likewise, to the extent she spoke as an expert about her other clients, I agree that her remarks were improper.[12] *See id.* In hindsight, I agree that I should have sustained the defendants' objection to this line of argument.

---

[11] (...continued)
spoke with the imprimatur of the state, which augmented the prejudicial effect of any improper comments. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (reasoning that because "the average jury . . . has confidence that [the prosecutor's] obligations . . . will be faithfully observed[,]" "improper suggestions, insinuations, and especially, assertions of personal knowledge [made by the prosecutor] are apt to carry much weight against the accused when they should properly carry none.").

[12] I do not find anything improper in counsel's final comments about the honor of representing Gilster, as it is a regular practice for attorneys to make such comments in closing argument.

However, the defendants have failed to meet their burden to "mak[e] a concrete showing of prejudice." *See City of Malden*, 887 F.2d at 164. It was undisputed that Gilster complained about sexual harassment. Additionally, Gilster testified about her own fears before making her complaint, and her husband corroborated her testimony. Thus, the record already included evidence of the fear that Gilster might have felt before lodging her complaint, and I see little to no prejudice that could result from counsel's efforts to emphasize this point. Moreover, I believe the lawyers on both sides would agree that my practice is to give lawyers in my courtroom significant leeway when they interact with the jury, from jury selection to opening statements and closing arguments. *See Christmas*, 682 F.3d at 642 (suggesting that leeway given to both sides lessened any possible prejudice from inappropriate comments by counsel). Furthermore, as I have already noted, the lawyers in this case were zealous and dedicated in their representation; I believe that this is precisely the type of situation contemplated by the Eighth Circuit Court of Appeals when it cautioned courts against ordering new trials based on comments made in the context of a "hotly contested trial." *See Zurich Ins.*, 527 F.2d at 531.

I am not convinced by the defendants' argument that the size of the verdict, particularly emotional distress damages, is "prima facie evidence" that counsel's remarks prejudiced the jury. *See* Defendant's Brief at 24 (docket no. 82-1). The defendants assert that Gilster's case turned on her credibility, and that counsel's remarks improperly tipped the scales in her favor. First, Gilster's emotional distress damages, in particular, did not turn solely on Gilster's testimony; both Gilster's husband and Nurse Practitioner Pratt corroborated Gilster's emotional distress. Additionally, although Gilster's credibility was certainly central to this case, Gilster's success did not hinge only on her credibility. Gilster presented independent evidence, beyond her own testimony, that cast doubt on the credibility of the defendants, by showing that their alleged reasons for firing her were

pretext. The jury could have made the reasonable inference that if the defendants would lie about their reasons for firing Gilster, the defendants' credibility, as a whole, was suspect.

Perhaps most important of all to the prejudice calculus, at the beginning of the trial, I instructed the jury that "[s]tatements, arguments, questions, and comments by the lawyers," are not evidence, *see* Jury Instructions at 4 (docket no. 66), and I reminded them after closing arguments, when I read them their final instructions, that they must "base [their] verdict solely on the evidence and on the law as I have given it to you in my Instructions[,]" *see id.* at 33. Although I did not give a specific curative instruction at the time of the remarks by Gilster's counsel, as I overruled the defendants' objection, my instruction to the jury—that lawyers' arguments are not evidence—further alleviates any risk of prejudice here. *See Higgins v. Hicks Co.*, 756 F.2d 681, 684 (8th Cir. 1985) (finding no prejudice because "the court instructed the jury on at least two occasions that closing argument comments of counsel are not evidence," even though "[t]he district court overruled plaintiffs' objections to [opposing counsel's] remarks"). Therefore, I find no "concrete prejudice" resulted from the comments to which defense counsel objected in Gilster's rebuttal closing argument.

I now review, for plain error, those comments to which the defendants did not object, keeping in mind the high hurdle the defendants must clear in order to establish that a new trial is required—that these statements were "so prejudicial as to cause a miscarriage of justice." *See Manning*, 953 F.2d at 1092-93. I evaluate prejudice in the context of the entire trial. *See Silbergleit v. First Interstate Bank of Fargo, N.A.*, 37 F.3d 394, 398 (8th Cir. 1994). If I determine that any particular comment was improper, I consider the prejudice from that comment in concert with prejudice from any other improper comments—both those to which the defendants did not object and those to which they did

object, analyzed above—to decide if, together, they caused a miscarriage of justice. *See id.* (ordering new trial, where plaintiff in age discrimination case objected to defense counsel's question about plaintiff's wealth but not to questions about his religion and unemployment benefits, and reasoning, "It is not necessary that we decide whether any one of these evidentiary issues would be a sufficient basis for the grant of the new trial, as that is not the issue before us. When all the objectionable episodes are viewed together, however, we conclude that evidence came before the jury that was improper and prejudicial. In so far as there is any doubt that portions of the evidence were not the subject of objection, the evidence, taken together, certainly is plain error." (citation omitted)).

I discuss together several comments by Gilster's counsel in which she referred to how she, personally, felt about sex discrimination in the workplace:

> And I am absolutely and completely offended as a female, as a person that he would sit here and tell you that it takes a lot to offend Mindy Gilster if you believe April Countryman. You know what? It takes a lot to offend me too when I'm outside the workplace, but when I'm at work, it is absolutely reasonable of me to expect to be treated with dignity and respect, and she deserved that.

Transcript of Rebuttal Closing Argument at 5:19-25 (docket no. 82-4).

> If my boss was touching me inappropriately, massaging my shoulders, pressing up against me in the break room, asking me for oral sex, I have every right to be offended. And when I'm offended, I get to go to my employer, and I can expect that they're going to take the action necessary to make it stop and to stop retaliation against me for those complaints.

*Id.* at 6:5-10.

> Now, Mindy didn't tell Miss Pratt right away, but I'll
> tell you something. Most women don't. I think first we try to
> deal with it.

*Id.* at 14:2-5. I agree with the defendants that, as a general matter, lawyers should not

inject personal beliefs or personal views of the facts of the case into closing argument. *See*

*Segal*, 649 F.2d at 604. Here, however, although Gilster's counsel referred to herself in

the first person, I find that a reasonable juror would hear these comments, as I did at trial,

and understand that Gilster's counsel meant to refer to how people generally feel about

their workplaces, what they can expect in the workplace versus outside of it, and how

women, as a general matter, might react to sex discrimination. I do not find them to be

improper. *See Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261, 269 (5th Cir.

1994) ("Even experienced trial lawyers have been known to occasionally and inadvertently

use the word 'I' during closing arguments.").

I next address a comment in which Gilster's counsel referred to an Iowa Civil

Rights Commission handout that was not introduced as evidence:

> There's a handout; the Iowa Civil Rights Commission
> talks about reasons why people are afraid to report sexual
> harassment. And one of the questions on this form at the
> bottom asks an inevitable question that arises is why do
> employees put up with harassment and delay reporting or fail
> to report it to the employer? And the answer is one word, and
> it's simple: Fear. Fear of loss of job opportunities, fear of
> being labelled not being considered a team player, fear of
> being labelled oversensitive or mentally unstable, fear of loss
> of the job.
> Defendants did all those things to Mindy Gilster.

Transcript of Rebuttal Closing Argument at 15:20-16:4 (docket no. 82-4). The Iowa Civil

Rights Commission handout was not an exhibit in evidence, and it is well-settled that

counsel may not argue facts not in evidence. *See Vasquez-Garcia*, 340 F.3d at 641. I am

not convinced this argument was improper, however.  Counsel did not suggest that the state agency handout was a document the jury should consider as evidence.  Rather, counsel referred to the handout to help the jury understand retaliation generally, which is more akin to a lawyer's permissible allusion to a "widely recognized authority," *see Harris*, 856 F.2d at 68, than an improper reference to material not in evidence.  Moreover, even if improper, I see no prejudice, as the reference to the handout itself was fleeting, *see City of Malden*, 887 F.2d 164 (noting brevity of improper comment reduces prejudice), and the thrust of counsel's argument—explaining fear of retaliation in the workplace—was entirely permissible.

Gilster's counsel also twice referred to the experiences of her other clients:

> There are plenty of my former clients who I was able to ensure were back in the workplace and everything has been fine and they still work there.

Transcript of Rebuttal Closing Argument at 4:1-3 (docket no. 82-4).

> Some of us deal with things in different ways.  There's no doubt.  I have clients who go to church more, who talk to their pastor or their priest, who go out with their friends or family members, who confide in –– who do actually go see counselors.  I have clients who turn to alcohol, a glass of wine before bed.

*Id*. at 14:20-25.  These comments were inappropriate, as closing argument is not a vehicle for counsel to "testify as an expert witness" about her specialized knowledge as a civil rights lawyer of how clients feel about and react to employment discrimination.  *See Segal*, 649 F.2d at 604 (noting that attorney should not "testify as an expert witness" in closing).  However, any prejudice from these comments is minimal.  The comments were isolated and brief, *see City of Malden*, 887 F.2d at 164, in the context of lengthy closing arguments

that lasted nearly two and a half hours. I do not find that these comments were "so prejudicial as to cause a miscarriage of justice." *See Manning*, 953 F.2d at 1092-93.

Next, I examine the most problematic comments of those to which the defendants did not object at trial—two instances in which Gilster's counsel vouched for Gilster's credibility:

> And I assure you Mindy Gilster did not make up the fact that her uncle sexually abused her at age 12. It was not a fact she brought in here to arouse sympathy or ask for more money. It's just the facts, folks.

Transcript of Rebuttal Closing Argument at 12:12-15.

> All I can tell you is from my conversations with Mindy is that she doesn't recall saying it started then. She recalls saying –– and she didn't go see the doctor till August 1, 2008. I'm not saying Miss Pratt's record's wrong. Maybe what happened is she was asked, hey, when do you think this started, a few months ago, maybe around Christmastime, and that's what's written.

*Id*. at 13:6-12. The law is clear: counsel cannot vouch for her client's or a witness's credibility in closing arguments. *Segal*, 649 F.2d at 604; *Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis*, 723 F.2d 512, 526-27 (7th Cir. 1983) (noting counsel's argument that his client was an "honest person" was improper but finding no prejudice); *see also* IOWA R. PROF'L CONDUCT 32:3.4(e). I agree with the defendants that these comments were clearly improper.

Nonetheless, the defendants' indignance at these comments rings hollow, as defense counsel also tread on dangerous ground by commenting on the credibility and integrity of Gilster's counsel. When addressing Gilster's testimony that Strub's sexual harassment brought back memories of the sexual abuse she suffered as a child, defense counsel argued that Gilster's lawyers engaged in strategies to mislead the jury:

45

Don't think for a moment that I'm making light of that terrible situation. That shouldn't happen to anyone. But if what the plaintiff told you was true, where is it in those medical records? What did Elizabeth Pratt say that connects all of this up? *And why shouldn't you think that this was just one more clever strategy by her lawyers to invoke more sympathy and result in a bigger verdict?*

Transcript of Defense Closing Argument at 14:6-16 (docket no. 88) (emphasis added). Defense counsel's insinuation that Gilster's case was a series of "clever strateg[ies] by her lawyers to invoke more sympathy and result in a bigger verdict" was improper. *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005) (finding that prosecutor's statements "accusing defense counsel of conspiring with the defendant to fabricate testimony" were "highly improper because they improperly encourage the jury to focus on the conduct and role of [the defense] attorney rather than on the evidence of [the defendant's] guilt. Such personal, unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal *or civil case*." (emphasis added)); *accord United States v. Darden*, --- F.3d ----, 2012 WL 3168546, at *10-11 (8th Cir. Aug. 7, 2012) (Melloy, J., concurring in part and dissenting in part).

As noted above, courts are reluctant to find prejudice when a case is "hotly contested" and both parties test the boundaries of appropriate remarks for closing argument. *See Zurich Ins.*, 527 F.2d at 531; *Christmas*, 682 F.3d at 642 ("Plaintiffs are not very precise on how Defendants' counsel's conduct prejudiced the jury. It appears the district judge gave both parties latitude in presenting their cases to the jury."). Here, both parties vociferously argued their cases and struck hard blows. Moreover, the two isolated incidents of vouching by Gilster's counsel, even absent defense counsel's comments, are not so prejudicial as to require a new trial. Again, Gilster's case did not turn solely on her own credibility, as she marshaled extensive evidence to rebut the defendants' alleged

nondiscriminatory reasons for firing her, which called the defendants' credibility, as a whole, into question. Thus, in the context of the entire trial, I do not find the two instances of vouching by Gilster's counsel to be "so prejudicial as to cause a miscarriage of justice." *See Manning*, 953 F.2d at 1092-93.

In sum, none of the improper comments, to which the defendants did not object, is prejudicial when considered separately, as explained above. Considering them in concert with the comments to which the defendants did object, I am convinced that any prejudicial effect from Gilster's counsel's improper closing remarks, even when aggregated, did not "cause a miscarriage of justice," *see Manning*, 953 F.2d at 1092-93, because I specifically instructed the jury that lawyers' arguments are not evidence and reminded the jury, after they heard closing arguments, that they must decide this case solely on the evidence before them. *See* Jury Instructions at 4, 33 (docket no. 66).

Therefore, I deny the defendants' motion for new trial.

## B. Gilster's Motion For Equitable Relief And Front Pay

Gilster has moved for front pay and for an injunction against Primebank. I consider each in turn.

### 1. Front Pay

In recognition of the opportunities for future employment that individuals may lose as a result of employment discrimination and retaliation, Title VII provides two alternate forms of relief: reinstatement and front pay. *See Baker v. John Morrell & Co.*, 263 F. Supp. 2d 1161, 1170 (N.D. Iowa 2003). Reinstatement of employment with the defendant employer is the preferred remedy of the two, and front pay may only be awarded after a court determines that "reinstatement is impractical or impossible . . . ." *Sellers v. Mineta*, 358 F.3d 1058, 1064 (8th Cir. 2004). "Substantial hostility, above that normally incident

to litigation, is a sound basis for denying reinstatement." *United Paperworkers Int'l Union, AFL-CIO, Local 274 v. Champion Int'l Corp.*, 81 F.3d 798, 805 (8th Cir. 1996).

After the case was submitted to the jury, the parties presented evidence to me regarding reinstatement and front pay. Gilster testified that she wanted to be reinstated at Primebank. The defendants stated that they opposed reinstatement, and Primebank's HR officer Ann Schulz testified that she did not believe reinstatement would be possible, given the extreme hostility between Gilster and Primebank's employees and management. After hearing the evidence, I told the parties that, although I recognized reinstatement to be the preferred remedy, I did not believe reinstatement to be at all realistic here. I confirm that opinion now. The evidence at trial showed "substantial hostility" between Gilster and other employees at Primebank—a hostility that preceded and far exceeded that which is "normally incident to litigation." Moreover, this hostility was not cabined to Primebank's Sioux City branch; both Sioux City and Le Mars office employees were involved in reporting Gilster's mistakes to Primebank management and testified to their distrust of Gilster. Additionally, the defendants' adamant opposition to reinstatement is a powerful indicator that reinstatement is impractical. *Cf. Kucia v. Se. Ark. Cmty. Action Corp.*, 284 F.3d 944, 948 (8th Cir. 2002) (reversing district court's grant of front pay in lieu of reinstatement and remanding for court to reconsider whether reinstatement was actually "impracticable or impossible," particularly where "defendant was willing to give [plaintiff] her position back."). Therefore, I conclude that reinstatement, while preferred generally, is not the preferred remedy here.

### a. Factors in Determining Front Pay

I now turn to the possibility of front pay. Gilster moves for nine years, eight and one half months of front pay, totaling $279,238.80. The defendants insist that no front pay, or one year at most, is appropriate. "A district court may exercise its equitable

48

discretion to award sufficient front pay to make a party whole when reinstatement is impractical or impossible." *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 555 (8th Cir. 1998). "An equitable award of front pay is generally appropriate when reinstatement must be denied." *United Paperworkers Int'l Union*, 81 F.3d at 805. The Eighth Circuit Court of Appeals has instructed that front pay "should address the plaintiff's equitable needs, including the ability to obtain employment with comparable compensation and responsibility." *Ollie v. Titan Tire Corp.*, 336 F.3d 680, 687 (8th Cir. 2003); *accord Christensen*, 481 F.3d at 1098. In considering whether front pay is proper and the appropriate duration of a front pay award, I look to *Ogden v. Wax Works, Inc.*, 29 F. Supp. 2d 1003 (N.D. Iowa 1998), *aff'd*, 214 F.3d 999 (8th Cir. 2000), in which I analyzed, in detail, the equitable remedy of front pay and the factors that may be important in determining the length of a front pay award.[13] Recognizing that these factors are not all-inclusive and that I should, in any event, "consider all the circumstances involved," *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 502 (8th Cir. 1998), I use the *Ogden* factors to guide my analysis here:

- (1) the plaintiff's age;
- (2) the length of time the plaintiff was employed by the defendant employer;
- (3) the likelihood the employment would have continued absent the discrimination;
- (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment;
- (5) the plaintiff's work and life expectancy;
- (6) the plaintiff's status as an at-will-employee;
- (7) the length of time other employees typically held the position lost;

---

[13] Both parties apply the *Ogden* factors, or iterations of them from my later cases, in their analyses of front pay.

- (8) the plaintiff's ability to work;
- (9) the plaintiff's ability to work for the defendant-employer[14]
- (10) the employee's efforts to mitigate damages
- (11) the amount of any liquidated or punitive damage award made to the plaintiff.[15]

*Ogden*, 29 F. Supp. 2d at 1015.

"[A] front pay award must be based on evidence." *Salitros v. Chrysler Corp.*, 306 F.3d 562, 571 (8th Cir. 2002). In making factual findings as to front pay, "the district court is not free to reject or contradict findings by the jury on issues that were properly submitted to the jury, but the district court 'retains its discretion to consider all the circumstances in th[e] case when it determines what equitable relief may be appropriate.'" *Newhouse v. McCormick & Co., Inc.*, 110 F.3d 635, 641 (8th Cir. 1997) (quoting *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101 (8th Cir. 1982)); *accord Salitros*, 306 F.3d at 573 ("In fashioning equitable relief, the district court may take into account facts that were not determined by the jury, but it may not base its decision on factual findings that conflict with the jury's findings.").

### Age, Work and Life Expectancy

Gilster is thirty-two years old and has an additional life expectancy of 49.8 years. Generally, a plaintiff's "young age should improve her future opportunities to mitigate through other employment." *United Paperworkers Int'l Union*, 81 F.3d at 805. I find that Gilster's young age and ability to work for many years in the future "do[] not counsel

---

[14] I have already determined that reinstatement is not appropriate. Therefore, this factor weighs in favor of a front pay award.

[15] Gilster is able to recover only $50,000, or approximately 8%, of the $600,000 in punitive damages awarded to her by the jury. Her limited punitive damages award counsels in favor of front pay.

against an award of front pay but rather . . . against a lengthy award." *See Baker*, 263 F. Supp. 2d at 1177.

### Length of Employment with Primebank

Gilster worked for Primebank for three years and two months. While not as long as other cases in which I determined that the plaintiff's length of employment strongly supported a front pay award, *see, e.g.*, *Dollar v. Smithway Motor Xpress, Inc.*, 787 F. Supp. 2d 896, 921 (N.D. Iowa 2011) (nine years with defendant employer); *Baker*, 263 F. Supp. 2d at 1178 (seventeen years), three years shows stability in Gilster's employment with Primebank. Moreover, prior to Primebank, Gilster had worked for six years at other local banks, which also demonstrates stability in the banking industry. Thus, I find this to be a factor that favors front pay.

### Likelihood Gilster would have remained in her position, Gilster's status as an at-will employee

I consider the third and sixth factors together. Although Gilster was an at-will employee, I find it highly likely that she would have remained in her position, absent the retaliation that followed Gilster's complaints. Primebank clearly thought of Gilster as an asset, at least when it first hired her: Strub specifically recruited Gilster from a local competitor to join Primebank's new Sioux City branch. Gilster testified that she loved her job at Primebank, found it fulfilling, and wished she still worked there. Gilster's performance reviews were extremely positive in the first two years she worked at Primebank and indicated that she was great with customers and skilled with her loan processing duties. *See* Plaintiff's Trial Exs. 1, 18 (docket no. 69-1, 69-14). The defendants argue that Gilster's employment with Primebank would not have continued because Gilster's annual reviews deteriorated at the end of her employment, she engaged in "check-kiting," and she was disruptive. These are the same alleged legitimate,

nondiscriminatory reasons for Gilster's termination that the jury rejected. Moreover, even if I were free to ignore the jury's findings, *see Newhouse*, 110 F.3d at 641, I likewise do not find the defendants' alleged reasons for firing Gilster convincing, based on the evidence Gilster produced to rebut them. The defendants also assert that Gilster's work history demonstrates that she does not stay at jobs for long-term periods, as she worked for three years at Liberty National Bank before Primebank, ran an in-home daycare for six months prior to that, and previously worked for three years at First Federal Bank in Sioux City. I do not share the defendants' view of Gilster's employment history. I find that Gilster's relatively steady employment history in the banking industry suggests that she would have remained with Primebank. Thus, these circumstances counsel in favor of a front pay award.

***Ability to Work, Length of Time to Find Comparable Employment***

Gilster is able to work full-time and has found employment as a full-time assistant manager, thirty hours per week,[16] at Maurice's clothing store. However, this position pays $11.24 per hour, compared to $16.80 per hour, Gilster's hourly wages when Primebank fired her. Gilster has applied for banking positions with at least four banks in the Sioux City area but has not been accepted. Given that Sioux City is a relatively small community and that Gilster has been rejected from every banking job for which she has applied, despite having approximately nine years experience in the banking and loan industry, I make the reasonable inference that being fired from and filing a lawsuit against Primebank will make it difficult or impossible for Gilster to ever get a job in the banking industry in the greater Sioux City area, especially in the light of the large and well-

---

[16] The defendants indicated at oral argument that they do not dispute that thirty hours per week constitutes full-time employment in the retail industry.

publicized verdict Gilster won.[17]  Moreover, because Gilster's skill set is in banking and loan processing, I find it unlikely that Gilster will be able to find employment with comparable pay and benefits in another industry in the near future.  These circumstances weigh in favor of a front pay award.

### Length of Time Other Employees Typically Held the Position Lost

Although there was ample evidence at trial that a number of Primebank employees have worked at Primebank for many years, there was little evidence as to the typical length of time other employees held Gilster's precise position.  As Gilster notes, however, there were multiple testifying employees who began working for Primebank many years ago and gradually advanced from positions, such as teller, to upper management, suggesting that even though their positions might change, employees stay at Primebank.  Though I do not speculate as to whether Gilster would have been promoted at Primebank, I note that Primebank does appear to keep its employees long-term.  Thus, I find that this factor weighs in favor of a front pay award.

### Plaintiff's Efforts to Mitigate Damages

"A Title VII claimant seeking . . . front pay damages has a duty to mitigate those damages by exercising reasonable diligence to locate other suitable employment and maintain a suitable job once it is located." *Baker*, 263 F. Supp. 2d at 1179.  "The burden of proving that the employee did not make reasonable efforts is on the defendant." *Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir. 1999).  As the Eighth Circuit Court of Appeals has explained,

---

[17] I take judicial notice of an April 13, 2012, article published in the *Sioux City Journal*, northwest Iowa's major newspaper, that detailed Gilster's case and winnings against Strub and Primebank.

> Wrongfully discharged claimants must use reasonable efforts
> to mitigate their damages, *see, e.g., Fiedler v. Indianhead
> Truck Line, Inc.*, 670 F.2d 806, 809 (8th Cir. 1982), but this
> burden is not onerous and does not require success. *See, e.g.,
> Rasimas v. Michigan Department of Mental Health*, 714 F.2d
> 614, 624 (6th Cir. 1983) (reasonable diligence standard), *cert.
> denied*, 466 U.S. 950 (1984). All that is required by law is an
> honest, good faith effort. *E.g., United States v. Lee Way
> Motor Freight, Inc.*, 625 F.2d 918, 938 (10th Cir. 1979).

*Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir. 1988). "In general, a plaintiff fails to mitigate adequately and therefore is not entitled to front pay to the extent he or she fails to remain in the labor market, fails to accept substantially similar employment, fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason." *Dollar*, 787 F. Supp. 2d at 922 (citation, internal quotation marks, and alterations omitted).

I find that Gilster has made an "honest, good faith effort" to mitigate her damages by beginning full-time work at Maurice's nearly immediately after she was fired by Primebank. She has sought at least four jobs in the banking industry and two jobs as an office manager but has not been accepted. The defendants argue that Gilster has failed to mitigate by not completing her college degree. I disagree. The defendants demand far beyond an "honest, good faith effort," when they require a mother of three, working full-time, to return to college in order to mitigate her damages. Moreover, the defendants cite no case law in support of the proposition that a plaintiff, to mitigate her damages, must acquire qualifications beyond those required for the job she lost as a result of the defendants' unlawful acts. A college degree was not required for Gilster's job at Primebank; accordingly, she has not failed to mitigate her damages by not finishing her degree. Additionally, the defendants note that, while Gilster was employed at Primebank,

she worked part-time at Maurice's. The defendants contend that Gilster has failed to mitigate her damages because, since Primebank fired her, she has only worked one full-time job and has not sought an additional part-time job. However, the defendants, though the burden is on them to show a failure to mitigate, cite no evidence as to whether Gilster's schedule at Maurice's would even permit her to work an additional part-time job. I am unconvinced by this undeveloped argument. Finally, again regarding Gilster's job at Maurice's, the defendants argue that because Gilster has been able to find full-time employment at Maurice's, her front pay award should be reduced. I do not dispute, nor does Gilster, that, in calculating Gilster's front pay award, I should subtract Gilster's projected income at Maurice's from any front pay award. In sum, I am satisfied that Gilster has mitigated her damages; the defendants have failed to meet their burden to show otherwise.

Based on my consideration of the *Ogden* factors and all the circumstances present here, I conclude that front pay is appropriate.

### b.      Calculation of Front Pay

In calculating Gilster's front pay, I must first determine its duration. *Dollar*, 787 F. Supp. 2d at 923-24. My analysis of whether front pay is appropriate guides me in doing so, as "[t]here is much overlap between the facts relevant to whether an award of front pay is appropriate and those relevant to the size of the award." *See Newhouse*, 110 F.3d at 643 (quoting *Dominic v. Consol. Edison Co. of N.Y., Inc.*, 822 F.2d 1249, 1257 (2d Cir. 1987)). "Determining front pay necessarily involves uncertainty, and the district court has discretion in determining an appropriate award[,]" *Curtis v. Elecs. & Space Corp.*, 113 F.3d 1498, 1504 (8th Cir. 1997), but "a front pay award must be grounded in available facts, acceptable to a reasonable person and not highly speculative[,]" *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994).

I determine that front pay of five years is appropriate. It is highly likely that Gilster would have remained at Primebank. Gilster was such an asset that Strub recruited her from a competitor bank. Furthermore, she received favorable evaluations while working at Primebank, until Strub and Primebank began retaliating against her. Realistically, it will be impossible for Gilster to get a job with a local bank in Sioux City, not only because Primebank fired her, but also because she won a large and publicized verdict against Primebank. Moreover, despite her job search, she has not been able to secure a job with similar pay, and it does not appear likely that, at least in the near future, she will be able to secure a job with comparable pay and benefits, given that her skill set is in banking. Five years front pay is sufficient for Gilster to gain the qualifications necessary to become competitive in a different field and to complete her education, if she wishes, so that she may secure employment with wages and benefits that are comparable to her job at Primebank. Thus, I award five years front pay.

I now must calculate Gilster's estimated yearly income from Primebank, less her mitigation income earned at Maurice's. *See Dollar*, 787 F. Supp. 2d at 924.

Gilster requests the following yearly front pay, as calculated in her Exhibit A (docket no. 80-2):

**Expected Yearly Pay from Primebank**

Lost Wages: $17.40/hour x 40 hours/week x 52 weeks/year = $36,192.00

Overtime:   $26.10/hour x .6 hours/week x 52 weeks/year = $814.32

Paid Sick Leave (6 days):                    = $835.20

Paid Vacation (10 days):                     = $1,392.00

Paid Holidays (9 days):                      = $1,252.80

Yearly Bonus ($75):                          = $75.00

401(k) Employer Match 50%                    = $556.22

**Subtotal** = $41,117.54

*Less*

**Expected Mitigation from Employment at Maurice's**

Wages: $11.24/hour x 30 hours/week x 52 weeks

("reduced to $9.50/hour x 12.5 hours/week x 52 weeks")[18] = $11,359.40

---

[18] Gilster has reduced her expected mitigation income because she would have continued working part-time at Maurice's if Primebank had not fired her. Unfortunately, Gilster offers very little explanation of how she calculated this reduction in income. The only indication comes from a single sentence in her brief: "Because Plaintiff had been working part-time at Maurice's before her termination, the amount of her mitigation was reduced by the amount she would have made at Maurice's had she continued to be employed by Primebank." Gilster's Brief at 3 (docket no. 80-1). She does not explain how she calculated her hourly wage of $9.50/hour or her schedule of 12.5 hours/week. This is especially confusing because Gilster testified at trial that she worked 15 to 20 hours per week at Maurice's while employed with Primebank. I gather that, for her front pay calculations, Gilster averaged the 15 to 20 hours that she worked at Maurice's to arrive at 17.5 hours per week, and subtracted that number from the 30 hours per week Gilster actually works, to arrive at 12.5 hours per week for Gilster's adjusted mitigation income.

However, Gilster's math does not add up. Her Exhibit A reads, as follows:

**Mitigation**

**Maurice's**

$11.24/hour x 30 hours/week x 52 weeks

*(reduced to $9.50/hour x 12.5 hours/week x 52 weeks)*    $11,359.40

Exhibit A at 2 (docket no. 80-2). When I inquired at oral argument, Gilster maintained that, yes, indeed, she meant "reduced TO $9.50/hour x 12.5 hours/week x 52 weeks." However, the sum of $9.50 x 12.5 hours/week x 52 weeks is $6,175.00, not $11,359.40. Thus, it appears that Gilster's calculations, instead, should read: "reduced BY $9.50/hour x 12.5 hours/week x 52 weeks," which would be $17,534.40 (her total mitigation wages at Maurice's: $11.24/hour x 30 hours/week x 52 weeks) minus $6,175.00, which is how Gilster arrives at the sum of $11,359.40. At any rate, my disagreements with Gilster's calculations are, ultimately, irrelevant because, as explained later, I conclude that she may not reduce her mitigation income to account for her part-time job, given the particular facts

(continued...)

| Paid Personal Leave (5 days) | = $449.60 |
| Paid Holidays (6 days) | = $539.52 |
| Total Mitigation | = $12,348.52 |
| **REQUESTED YEARLY FRONT PAY** | **= $28,769.02** |

Gilster requests the yearly rate of $28,786.02 for any and all years she may receive front pay and does not request any increases from year to year. The defendants dispute several parts of Gilster's calculation. First, the defendants urge that I should calculate Gilster's front pay based on her hourly wage at the time she was terminated in February 2011: $16.80/hour. It appears from Gilster's calculations that she used her anticipated 2012 pay to calculate her front pay, including two $.30/hour annual bonuses, to arrive at $17.40/hour. Gilster testified that she was denied her annual $.30/hour raise at the end of 2010, and the reason Primebank gave was her poor performance evaluation. Therefore, when she was terminated in 2011, her salary was $16.80, not the $17.10 it would have been, but for the poor evaluation. As I have already concluded, there was sufficient evidence at trial to conclude that Strub gave Gilster a poor performance evaluation to retaliate against her. Thus, to advance the "make-whole" goal of front pay, I find it appropriate to include in Gilster's front pay calculation the raise she expected to receive, but did not, due to retaliation. I also find that it is reasonable to anticipate that Gilster, had she remained at Primebank and not been retaliated against, would have received her

---

[18](...continued)
of this case.

I note that Gilster also reduced her mitigation income when calculating back pay, *see* Gilster's Trial Ex. 54 (docket no. 69-46), an issue that was before the jury. Because the defendants, in their Motion For Judgment As A Matter Of Law, New Trial, Or Remittitur, did not object to this reduction in Gilster's back pay calculation, I did not consider it.

expected annual raise again at the end of 2011, bringing her hourly wages to $17.40 in 2012.[19] Gilster does not ask for any annual raise beyond the year 2012, and she asks that her 2012 pay be used to calculate her entire front pay award. Therefore, I use the 2012 figure of $17.40/hour to calculate Gilster's front pay.

Both parties agree that Gilster's anticipated wages from Primebank should be calculated based on a 40 hour work week. However, this is where the parties' agreement ends. The defendants object to all additional figures included in Gilster's calculations: overtime, paid sick leave, vacation, and holidays, her yearly bonus, and her 401(k) employer match of 50%.

Regarding overtime, I agree with the defendants that awarding Gilster future overtime is simply too speculative on the evidence before me. The only evidence at trial was that Gilster, based on her overtime in 2010, estimated she would have averaged .6 hours/week overtime in 2011 and in the first few months of 2012. I find this evidence insufficient to project Gilster's overtime into the future, as I have no information about Primebank's workload in the future and the amount Primebank would require its employees to work overtime.

As to Gilster's remaining fringe benefits, I note that "the purpose of awarding front pay is to compensate the plaintiff for what [she] would have had but for [her] wrongful termination . . . ." *See Hartley*, 310 F.3d at 1063. The Eighth Circuit Court of Appeals

---

[19] Moreover, the jury's back pay findings preclude me from finding otherwise. The jury awarded Gilster the full back pay for 2011 and 2012 that she requested, which included a $.30 annual raise at the end of 2010 and 2011. *See* Plaintiff's Trial Ex. 54 (docket no. 69-46). From this, I can infer that the jury found that Gilster, but for the defendants' retaliation, would have received her annual raise both years. Because I cannot contradict the jury's findings, I must, therefore, accept that Gilster's 2012 salary would have been $17.40/hour.

has affirmed the inclusion of benefits, such as vacation pay and employer contributions, in a front pay award. *See id.* Therefore, I reject the defendants' argument that Gilster categorically may not recover fringe benefits. I also find that Gilster has presented sufficient evidence for me to project her fringe benefits into the future. As to the yearly bonus, Gilster, as well as HR officer Ann Schulz, testified that Primebank gives its employees a $75 holiday gift each year. I find it likely that this holiday gift would continue, and thus include it in Gilster's front pay. As to paid sick leave, vacation, and holidays, there is no reason to expect Gilster would receive a different number of paid absences in the future than the number she received while at Primebank. Thus, I find it appropriate to include paid sick leave, vacation, and holidays, and I agree with Gilster's calculations of the value of these days as eight hours a day, multiplied by her hourly rate of $17.40. As to employer contributions, Gilster testified that while at Primebank, she contributed 3% to her 401(k), and Primebank matched 50% of her contribution, or 1.5%. I find it reasonable to conclude that Gilster would have continued her practice of contributing to her 401(k) and that Primebank would have continued its 50% match. Gilster calculates Primebank's yearly projected employer match to be $556.22, and it appears that she arrives at this number because she includes Gilster's wages, overtime, and $75 holiday gift in her yearly salary. However, because I do not include overtime in Gilster's front pay award and there is no evidence that Primebank's yearly holiday gift would be included in the sum used to calculate Primebank's 401(k) match, I use Gilster's yearly projected lost wages as a starting point and arrive at the sum of $542.88 ($36,192 x .015).

As to the calculation of Gilster's mitigation income at Maurice's, I determine her yearly wages by multiplying her hourly pay, the hours per week she works, and the number of weeks in a year: $11.24/hour x 30 hours/week x 52 weeks. Gilster testified at

trial that she currently earns $11.24/hour, and I see no evidence that her hourly rate will change in the future. I disagree with Gilster's calculation of her income at Maurice's, in which she reduces her projected income because she would have continued working part-time at Maurice's, in any event, had Primebank not fired her. Gilster is correct that, as a general principle, any additional income that a plaintiff earned, unrelated to her job with the defendant employer, and that she continues to earn after being discharged, should not be used to offset a front pay award. In *Belk v. City of Eldon*, 228 F.3d 872 (8th Cir. 2000), a First Amendment retaliation case, the Eighth Circuit Court of Appeals rejected an employer's argument that, in addition to deducting the plaintiff's new salary from her front pay award, the plaintiff's income from farming investments should also be deducted. The court reasoned,

> [The plaintiff] had begun to make her agricultural investments while still employed with the city. Thus, any farming income would have been additional to her salary as a city employee. Because the purpose of awarding front pay is to compensate the plaintiff for what she would have had but for her wrongful termination, the district court was correct in not penalizing [the plaintiff] for farming income that she would have had in any case.

*Id.* at 883. Gilster is certainly right that, like the farming income in *Belk*, her part-time income at Maurice's is income "that she would have had in any case," had she continued to work at Primebank. The difference here, however, is that the farming income in *Belk* was income the plaintiff earned above and beyond the new job she secured following her unlawful discharge. I would agree completely with Gilster's argument that I should not deduct the value of her part-time job at Maurice's—*if* Gilster were working a full-time job *in addition to* working part-time at Maurice's. The problem with Gilster's calculation of her mitigation income is that it ignores her duty to mitigate: if I discount Gilster's

mitigation income to account for the part-time work Gilster would have done anyway at Maurice's, I effectively require Gilster to work only part-time to mitigate her damages. I conclude that Gilster's full-time wages at Maurice's are the appropriate touchstone for calculating her mitigation income. Finally, I agree with Gilster's inclusion of her paid personal leave and paid holidays in her projected mitigation income, and I agree that these days should be calculated by multiplying Gilster's hourly rate of $11.24 by an eight hour work day.

Therefore, I calculate Gilster's front pay, as follows:

**Expected Yearly Pay from Primebank**

| | |
|---|---|
| Lost Wages: $17.40/hour x 40 hours/week x 52 weeks/year | = $36,192.00 |
| Paid Sick Leave (6 days): | = $835.20 |
| Paid Vacation (10 days): | = $1,392.00 |
| Paid Holidays (9 days): | = $1,252.80 |
| Yearly Bonus ($75): | = $75.00 |
| 401(k) Employer Match 50% | = $542.88 |
| **Total Lost Wages and Benefits:** | = $40,289.88 |

*Less*

**Mitigation Income**

| | |
|---|---|
| Wages: $11.24/hour x 30 hours/week x 52 weeks | = 17,534.40 |
| Paid Personal Leave (5 days) | = $449.60 |
| Paid Holidays (6 days) | = $539.52 |
| Total Mitigation | = $18,523.52 |

| | |
|---|---|
| **Yearly Front Pay Award** | = $21,766.36 |
| x 5 years | |

| | |
|---|---|
| **TOTAL FRONT PAY AWARD** | **= $108,831.80** |

I do not reduce the front pay award to present value for two reasons. First, neither party has briefed nor even mentioned the issue. Second, although there are several ways to account for the benefit to Gilster of receiving front pay as a lump sum,[20] I apply the total offset method, under which "no discount to present value is required on the theory that any interest rate which might otherwise drive a discount would be totally offset by such things as price inflation and real wage increases." *Baker*, 263 F. Supp. 2d at 1187 (citation, alteration, and internal quotation marks omitted); *accord Warren v. Cty. Comm'n of Lawrence Cty., Ala.*, 826 F. Supp. 2d 1299, 1318 (N.D. Ala. 2011). Here, because I did not factor future wage increases or inflation into Gilster's front pay award, it is

---

[20] Nevertheless, a lump sum front pay award is not entirely beneficial to Gilster, as her winnings will bump her into a higher tax bracket. To achieve the "make-whole" goals of anti-discrimination statutes, courts sometimes impose what I call a "tax equalizer," that is, an enhancement in the prevailing plaintiff's winnings so that the defendant, not the plaintiff, bears the burden of the negative tax consequences to the plaintiff of receiving front pay as a lump sum. *See O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 447 (E.D. Pa. 2000) (reasoning, in ADEA case, that courts may "compensate the [plaintiff] for the depletion of [front pay and back pay] due to the increased taxes to which the award is subject on account of its being received in a single tax year, rather than being spread out over time"). Of course, a plaintiff must present sufficient evidence to support the district court's application of a tax equalizer. *See Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 287 (8th Cir. 1993) (finding that the district court, in Title VII case, did not abuse its discretion when it refused to "enhance[] [the plaintiff's] monetary awards to compensate her for increased income tax liability resulting from receipt of the awards in one year, thus subjecting her to higher tax rates than she would otherwise pay on her wages and retirement benefits," where plaintiff did not present evidence to assist court in calculation of tax equalizer). I do not apply a tax equalizer here, as Gilster did not request it or provide evidence that would support it, but I note it as a possibility for future cases.

unnecessary to discount her award to present value. Accordingly, I award Gilster $108,831.80 in front pay.

## 2.    *Injunction Against Primebank*

Gilster moves for injunctive relief against Primebank under both Title VII and the ICRA, as follows:

> 1. An order requiring Defendants to cease and desist harassment and retaliation in violation of Title VII and the ICRA;
> 2. An order requiring Primebank to amend its current sexual harassment policies so that no preference is shown to the person accused of sexually [sic] harassment;
> 3. An order requiring Primebank to comply with the policy prohibiting sexual harassment contained in its employee handbook (as amended pursuant to paragraph 2);
> 4. An order requiring Primebank to adopt a clear policy explicitly prohibiting all retaliation, providing multiple examples of retaliation, warning of potential consequences for employees who violate the policy, identifying the employee(s) responsible for ensuring the policy is followed, and instructing employees how to report any retaliation that they believe has taken place;
> 5. An order requiring Primebank to provide all employees with training regarding sexual harassment and retaliation of at least one hour annually;
> 6. An order requiring Primebank to provide all managers and supervisors with training regarding sexual harassment and retaliation of at least two hours annually;
> 7. An order requiring Primebank to ensure that its Human Resources Director has undergone at least 36 hours of training regarding sexual harassment and retaliation by the end of 2012, in addition to at least six hours annually.

Gilster's Brief at 7-8 (docket no. 80-1). The defendants maintain that such relief is not necessary for the following reasons: Primebank responded properly to Gilster's claim of

sexual harassment and reprimanded Strub; Primebank already has a policy of sexual harassment with a retaliation provision; injunctive relief will not affect Gilster, as she is no longer employed by Primebank and will not be reinstated; several Primebank employees testified that they did not find the environment at Primebank to be hostile, and Gilster presented no witnesses to corroborate her hostile environment claims; Gilster's testimony demonstrated that, as a Primebank employee, she knew how to report sexual harassment or retaliation at Primebank; and, finally, there is no evidence of other sexual harassment or retaliation at Primebank.

Both Title VII and the ICRA authorize district courts, in their discretion, to issue injunctions against a defendant employer following a plaintiff's success on the merits.[21]

---

[21] Title VII instructs: "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate." 42 U.S.C. § 2000e-5(g)(1). Iowa Code § 216.15(9) provides:

> If upon taking into consideration all of the evidence at a hearing, the commission determines that the respondent has engaged in a discriminatory or unfair practice, the commission shall state its findings of fact and conclusions of law and shall issue an order requiring the respondent to cease and desist from the discriminatory or unfair practice and to take the necessary remedial action as in the judgment of the commission will carry out the purposes of this chapter.

IOWA CODE § 216.15(9). Although this provision refers to injunctive relief that the Iowa Civil Rights Commission may grant, the ICRA also provides that, for any ICRA action in court, "[t]he district court may grant any relief in an action under this section which is authorized by section 216.15, subsection 9, to be issued by the commission." *Id.* § 216.16(6); *accord Lynch v. City of Des Moines*, 454 N.W.2d 827, 835 (Iowa 1990) (explaining that a district court, in a case brought under the ICRA, "may grant any relief which would be available to the commission in an administrative proceeding under [the

(continued...)

However, I must first address a threshold jurisdictional issue that arises from the fact that Gilster, although she no longer works at Primebank and will not be reinstated, seeks an injunction that would prohibit Primebank from engaging in discrimination and retaliation and require Primebank to change its policies and implement training for its employees.[22]

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). At the heart of the case or controversy requirement is standing, which requires, for every case in federal court, that "[t]he plaintiff. . . show that the conduct of which [she] complains has caused [her] to suffer an 'injury in fact' that a favorable judgment will redress." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *accord City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (holding that although plaintiff had standing to assert claim for damages, he lacked standing for claim for injunctive relief). Whether a plaintiff has standing is determined by examining the circumstances at the time she filed her complaint. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (evaluating standing "at the time the second amended complaint was filed"). At the time of Gilster's second

---

[21](...continued)
ICRA] . . . .").

[22] Although the defendants have not raised mootness, I am obligated to examine the issue myself: "Federal courts must always satisfy themselves that [the case or controversy] requirement has been met before reaching the merits of a case. Courts employ a number of doctrines to determine justiciability such as standing, ripeness, and mootness." *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 983 (8th Cir. 2009) (citation and internal quotation marks omitted).

amended complaint, she certainly had standing to request injunctive relief prohibiting discrimination at Primebank and requiring training and policy implementation, as there was a possibility, at that time, that, if she succeeded on the merits of her claims, she would be reinstated with Primebank. *Cf. Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (finding that plaintiff in ADA case lacked standing to seek injunction requiring former employer to adopt and enforce disability discrimination policies because "she would not stand to benefit from an injunction requiring the anti-discriminatory policies she requests at her former place of work," where "[t]here [wa]s no indication in the complaint that [the plaintiff] ha[d] any interest in returning to work for the [defendant] . . . .").

Importantly, however, the Article III case or controversy requirement demands "a definite and concrete controversy involving adverse legal interests at every stage in the litigation." *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 983 (8th Cir. 2009) (citation and internal quotation marks omitted); *accord Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) ("[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."). "When, during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . . and a federal court can no longer grant effective relief,' the case is considered moot." *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000) (quoting *Beck v. Mo. State High Sch. Activities Ass'n*, 18 F.3d 604, 605 (8th Cir. 1994)). Here, although Gilster had standing, at the time of her second amended complaint, to seek the injunctive relief she requests, there has been a "change in circumstances," because it is now clear that she will not be reinstated, and there is no indication in the record that she otherwise will work for Primebank again. Thus, Gilster's claim for injunctive relief, which seeks to enjoin further discrimination at Primebank and to require Primebank to

alter its policies and train its employees, is moot, because that relief would not redress any injury Gilster has suffered or is likely to suffer in the future. Instead, it would benefit *only* other employees at Primebank, who are not parties to this lawsuit.[23] *See Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) ("Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party*." (citation and internal quotation marks omitted)); *Arizonans*, 520 U.S. at 67 (finding case moot, where state employee sought injunctive and declaratory relief from a state law requiring state employees to use English only, because plaintiff "lacked a still vital claim for prospective relief" when she quit her state job after filing her complaint); *Backus v. Baptist Med. Ctr.*, 671 F.2d 1100, 1102 (8th Cir. 1982) (finding case moot where plaintiff no longer worked for employer and "sought a declaration that [defendant's] policy barring the assignment of male nurses to the labor and delivery section violates Title VII and an injunction banning that practice in the future"); *Jadwin v. County of Kern*, No.

---

[23] Though not relying specifically on mootness grounds, other courts have denied injunctive relief in private employee discrimination cases like this one, where the plaintiff no longer works for the defendant and has not been reinstated. *See, e.g., Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563 (5th Cir. 1998) (finding injunction under the ADA inappropriate, where plaintiff "alleged only a single, past statutory violation and does not assert any likelihood that he will be subjected to a similar violation in the future," did "not indicate[] that he plans to seek employment with [the defendant] again, nor . . . purport to represent a specific class of individuals that is in danger of discrimination from Turner."); *Dybczak v. Tuskegee Inst.*, 737 F.2d 1524, 1527 (11th Cir. 1984) ("[I]n a suit brought in the plaintiff's individual capacity, injunctive relief benefiting nonparties is not required if it in no way relates to the vindication of the plaintiff's rights."); *Olian v. Bd. of Educ. of City of Chicago*, 631 F. Supp. 2d 953, 967 (N.D. Ill. 2009) (finding, in ADA case, that "injunctive relief is particularly inappropriate in this case, as Plaintiff no longer works for the Board and has no desire to return; as she is not a class representative, an injunction makes little sense, as it would have absolutely no effect on her individually.").

107-CV-00026-OWW-DLB, 2009 WL 2424565, at *8 (E.D. Cal. Aug. 6, 2009) (holding that plaintiff's claim, under the FMLA and a similar state statute, for injunctive relief requiring his former county employer to train its employees on the FMLA, was moot, because "[h]e is not an employee of the County, is not seeking reinstatement, and there is no reasonable likelihood that he will resume employment with the County. He has no personal stake in an injunction which requires staff of the County to be trained."); *see also Tennes v. Com. of Mass., Dep't of Revenue*, 944 F.2d 372, 382 (7th Cir. 1991) ("[The plaintiff's] request for injunctive relief from the discriminatory conduct by the Commonwealth is moot since he will not be reinstated to his former position.").[24]

I understand completely Gilster's desire for the injunctive relief she requests. The evidence at trial suggested a risk to *other* employees of retaliation and sexual harassment in the future,[25] and I agree that Primebank *should* train its employees and implement a

_____

[24] It appears that Iowa state district courts, not laboring under the limited jurisdiction granted by Article III, may order injunctive relief, under the ICRA, that requires a defendant employer to cease discrimination, implement policies, and train its employees, even where the plaintiff no longer works for the defendant and is not reinstated. *See Lynch*, 454 N.W.2d at 836 (approving, even where plaintiff no longer worked for defendant, "an order requiring [the defendant] to educate and train its employees not to engage in conduct prohibited by the Act"). In arriving at its conclusion in *Lynch* that such relief was appropriate, however, the Iowa Supreme Court did not specifically address the fact that the relief would not benefit the plaintiff, as the defendant, apparently, did not raise this issue. Even reading *Lynch* to permit, definitively, a state district court to enter injunctive relief like the kind Gilster requests here, where the plaintiff no longer works for the employer, I determine that I may not, because I am subject to the case or controversy requirement and may not impose an injunction that, in no way, redresses a harm to Gilster.

[25] An example of the need for sexual harassment training at Primebank comes from the testimony of president Matthew Ahlers, who, when asked about Strub's suggestion that

(continued…)

clearer retaliation policy.  However, as much as I might like to order Primebank to take affirmative steps to reduce the risk that another employee will find him or herself in Gilster's situation, I would exceed my authority under Article III if I did so, as this is a case brought by a single, private employee,[26] and I may not grant relief that, in no way, redresses a harm she has suffered or will suffer in the future.  Therefore, Gilster's request for injunctive relief is denied.

### 3.    *Additional Equitable Relief—Letter of Reference*

Because the record supports a reasonable inference that Primebank's firing Gilster has prevented her from securing a new job with comparable pay and benefits, I raised *sua*

---

[25](…continued)

Gilster come into his office, shut the door, and take her teeth out, referred to it as an "awful joke" and explained, "It's about oral sex, but he's trying to be [sic] a funny joke. He's not asking for oral sex." Testimony of Matthew Ahlers at 20:16, 21:5-6 (docket no. 63).  The efforts of Primebank's most senior employee to explain away Strub's conduct as a joke demonstrate the risk of continued sexual harassment in the future and the need for sexual harassment training for both Primebank's management and its employees.

As to the need for a clearer retaliation policy and retaliation training for Primebank employees, I cite the ample evidence at trial of the way in which the entire Sioux City branch of Primebank appeared to turn against Gilster after she complained about sexual harassment and retaliation.  Primebank's HR director Schulz testified that she had never received sexual harassment or retaliation training; moreover, rather than taking measures to prevent retaliation, she was the one who kept a "collection" of Gilster's mistakes after Gilster complained of retaliation.

[26] My analysis of the propriety of injunctive relief would be entirely different if this were a class action, or if this were a case brought by the EEOC, *see U.S. E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1253 (11th Cir. 1997) (contrasting discrimination claims brought by individuals with those brought by the EEOC and concluding, "Paigo's decision not to seek reinstatement in this case does not prevent the EEOC from pursuing the broader equitable remedies listed above, it being the EEOC, and not the individual claimant, that is suing.").

*sponte*[27] at oral arguments the possibility of an order requiring Primebank to provide Gilster with a neutral letter of reference. Gilster should not be forced "to bear the brunt of h[er] employer's unlawful conduct for the rest of h[er] working career." *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 863 (7th Cir. 2001) (explaining that "[a] court may use expungement [of employment records] as a means of removing the stain of the employer's discriminatory actions from the plaintiff's permanent work history."). Requiring Primebank to provide a neutral letter of reference is well within my broad authority to fashion equitable relief that will help to make Gilster whole—though I recognize that this is only a small step towards that goal. *See, e.g., Huffman v. New Prime, Inc.*, No. 01-3144-CV-S-ODS-ECF, 2003 WL 24009005, at *2 (W.D. Mo. Dec. 23, 2003) (ordering defendant to provide plaintiff with a neutral letter of recommendation); *see also E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998) (overturning other provisions of district court's injunction but affirming order requiring defendant to provide plaintiffs with letters of recommendation and to expunge plaintiffs' records); *E.E.O.C. v. DCP Medstream, L.P.*, 608 F. Supp. 2d 107, 113-14 (D. Me. 2009) (entering injunction requiring that, "[i]f asked by a prospective employer for information or a reference concerning [plaintiff], [the defendant] must provide only the dates of his employment and last position held . . . ." (internal quotation marks omitted)); *Rau v. Apple-Rio Mgmt. Co., Inc.*, 85 F. Supp. 2d 1344, 1351 (N.D. Ga. 1999) (enjoining defendant "from providing a negative evaluation of plaintiff's performance to any prospective employer").

---

[27] Although Gilster did not request a letter of reference, district courts have "not merely the power but the *duty*" to "eliminate the discriminatory effects of the past." *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (emphasis added). Therefore, I consider it appropriate to raise this issue *sua sponte*.

Thus, I order that Primebank provide Gilster with a neutral letter of reference. The parties have sixty days from the entry of this order to draft a letter suitable to both sides. On or before the expiration of this sixty day deadline, the parties shall file notice with the court indicating whether they have been able to agree to a neutral letter of reference. I do not expect a glowing recommendation but, instead, a compromise that reasonably accommodates both sides. If the parties are unable to agree, they may present the matter to me, and I will decide the wording of the letter.

### C. Gilster's Motion for Attorney Fees and Costs

Gilster, in her initial Motion For Attorney Fees And Expenses (docket no. 81), moves for $153,320.00 in attorney fees, $8,219.50 in legal assistant, legal secretary, and law clerk fees, and $18,254.16 in costs and expenses.

The number of hours claimed, and the hourly rates billed by Gilster's attorneys and their legal assistants, secretary, and law clerks, are, as follows:

**FEES CLAIMED FOR ATTORNEYS**

| Name | Hrs. | Rate | Total Fee Claimed |
|------|------|------|-------------------|
| Brooke Timmer | 419.05 | $200 | $83,810.00 |
| Whitney Judkins[28] | 474.3 | $125 | $57,975.00 |
| Paige Fiedler | 26.6 | $375 | $9,975.00 |
| Emily McCarty | 10.4 | $150 | $1,560.00 |

---

[28] When I multiply Judkins's hours worked by her hourly rate, I arrive at $59,287.50, not $57,975.00. Judkins did not bill for 9.8 hours of work she performed on 3/24/2012 and billed only $90/hour for her work on 3/29/2010 and 4/1/2010, and these billing entries account for the difference. I have no way of knowing whether these reductions were an error or the sole exercise of billing judgment in Gilster's entire motion for attorney fees. I do not question the reductions, but only note them for clarity's sake.

| Total Hrs. Claimed | 930.35 | Total Fee Requested | $153,320.00 |
| --- | --- | --- | --- |

**FEES CLAIMED FOR LEGAL ASSISTANTS, SECRETARY, AND LAW CLERK**

| Robin Daisy-Jahn[29] | 64.9 | $80 | $5,207.00 |
| --- | --- | --- | --- |
| Kristin Erdman | 14.05 | $80 | $1,124.00 |
| Cheryl Smith | 12 | $70 | $840.00 |
| Law Clerk | 11.65 | $90 | $1,048.50 |
| **Total Hrs. Claimed** | **102.6** | **Total Fee Requested** | **$8,219.50** |

In support of her motion, Gilster has included an itemized list of costs (Exhibit 1); an itemized list of hours billed by each of Gilster's lawyers and the staff at Fiedler & Timmer, P.L.L.C., in Des Moines, Iowa (Exhibit 2); affidavits of each lawyer who worked on the case: Brooke C. Timmer (Exhibit 3), Whitney Judkins (Exhibit 4), Paige Fiedler (Exhibit 5), and Emily McCarty (Exhibit 6); and affidavits of support from other Des Moines lawyers who specialize in employment discrimination law: Katie Ervin Carlson (Exhibit 7), Roxanne Conlin (Exhibit 8), David Goldman (Exhibit 9), Melissa Hasso (Exhibit 10), and Andrew LeGrant (Exhibit 11).

On August 2, 2012, Gilster filed a supplement (docket no. 111) to her Motion For Attorney Fees And Expenses, for additional work her lawyers performed since filing the initial fee motion on May 17, 2012, including resisting the defendants' post-trial motion, filing replies in support of Gilster's motions, providing supplemental briefing that I

---

[29] When I multiply Daisy-Jahn's hours worked by her hourly rate, I arrive at $5,192.00, not her reported fee of $5,207.00. The $15.00 difference comes from billing entries for faxes and errands to Office Depot. These should have been requested as costs, not fees. I strike them from Daisy-Jahn's reported hours and go with my calculation of $5,192.00.

requested, and appearing for oral arguments in July. Gilster requests an additional $18,230.50 in attorney fees, broken down as follows:

**FEES CLAIMED FOR ATTORNEYS AND STAFF**

| Name | Hrs. | Rate | Total Fee Claimed |
| --- | --- | --- | --- |
| Brooke Timmer[30] | 25.05 | $200/250 | $5,747.50 |
| Whitney Judkins | 72.2 | $125/150 | $9,610.00 |
| Paige Fiedler | 7 | $375 | $2,625.00 |
| Emily McCarty | 1.6 | $150 | $240.00 |
| Kristin Erdman | .1 | $80 | $8.00 |

Gilster also requests additional costs and expenses of $2,283.12.

### 1. *Applicable Standards*

The defendants do not dispute that Gilster is a prevailing plaintiff who may recover reasonable attorney fees and costs under Title VII and the ICRA. *See* 42 U.S.C. § 2000e-5(k); IOWA CODE § 216.15(9)(a)(8).[31] "[A] prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances." *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 417 (1978) (emphasis omitted).

---

[30] It appears that Timmer and Judkins's fees increased, as of July 1, 2012. Because they provide no argument or evidence as to why this increase in fees is justified, I will hold them to their initial rates of $200 and $125, respectively. An increase of 25% for Timmer seems particularly excessive, without a compelling justification. No such justification was provided here.

[31] I analyze together Gilster's request for attorney fees under both federal and Iowa law. *See, e.g.*, *Heaton*, 2007 WL 2301251, at *3 (applying same standards to request for attorney fees under Title VII and the ICRA); *Miller v. Davenport Cmty. Sch. Dist.*, No. 1999-588, 2000 WL 210292, at *7 (Iowa Ct. App. Feb. 23, 2000) (same).

The question, of course, is what amount of fees is *reasonable*. The lodestar—the number of hours reasonably expended multiplied by a reasonable hourly rate—is the touchstone for determining reasonable attorney fees. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (explaining that the lodestar is "the product of reasonable hours times a reasonable rate"); *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Warren v. Prejean*, 301 F.3d 893, 904 (8th Cir. 2002). The Eighth Circuit Court of Appeals has instructed that the factors identified in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), "should be used to set the reasonable number of hours and reasonable hourly rate components of the fee award formula[,]" *McDonald v. Armontrout*, 860 F.2d 1456, 1459 (8th Cir. 1988),[32] though districts courts need not "examine exhaustively and explicitly, in every case, all of the factors that are relevant to the amount of a fee award," *Griffin v. Jim Jamison, Inc.*, 188

---

[32] The *Johnson* factors are, as follows:

> (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*McDonald*, 860 F.2d at 1459 n.4 (citing *Johnson*, 488 F.2d at 717-19).

The Supreme Court in *Hensley* cautioned that "[t]he district court also may consider other factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (CA5 1974), though it should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 n.9.

F.3d 996, 997 (8th Cir. 1999). Significantly, "the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436.

The *Hensley* court detailed the lodestar method and several of the considerations that may be relevant in determining the reasonableness of both the attorneys' hourly rates and hours expended:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.
>
> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94-1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

*Hensley*, 461 U.S. at 433-34. I first consider the hourly rates for Gilster's attorneys and staff and then turn to whether the hours they worked were reasonable.

## 2. *Reasonable Hourly Rates*

The defendants challenge the hourly rates requested by Gilster's attorneys Paige Fiedler, $375/hour, and Brooke Timmer, $200/hour. The defendants maintain that Fiedler's rate exceeds the prevailing market rate for attorneys in Sioux City and in the state of Iowa, more generally, and that Timmer's rate is excessive, as she has practiced law for only six years. The defendants also note that the highest hourly rate Fiedler has been awarded in the past is $327.50, and that Timmer has only been awarded $200/hour once before, and, more often, has been awarded a rate of $175/hour.

"As a general rule, a reasonable hourly rate is the prevailing market rate, that is, 'the ordinary rate for similar work in the community where the case has been litigated.'" *Moysis v. DTG Datanet*, 278 F.3d 819, 828–29 (8th Cir. 2002) (quoting *Emery v. Hunt*, 272 F.3d 1042, 1047 (8th Cir. 2001)). "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the *community* for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 (1984) (emphasis added). As the Eighth Circuit Court of Appeals has noted, however, the Supreme Court did not define "community" in *Blum*. *See McDonald*, 860 F.2d at 1459 n.6. In *McDonald*, the court suggested that "community" should probably be given an expansive reading, and that the entire state may be the relevant market. *Id.* Moreover, the relevant market in specialized areas of law "may extend beyond the local geographic community." *Casey v. City of Cabool, Mo.*, 12 F.3d 799, 805 (8th Cir. 1993) (explaining, in a civil rights case, that "[a] national market or a market for a particular legal specialization may provide the appropriate market.").

Because employment discrimination is a specialized area of law, I find that the relevant market for determining the prevailing market rate extends beyond Sioux City and

northwest Iowa. Fiedler and Timmer's rates, given their skill, reputation, and experience, *see Johnson*, 488 F.2d at 717-19, are comparable to the prevailing market rates for employment discrimination lawyers in Des Moines (in fact, their rates might be considered low if I used a regional or national market to determine the prevailing market rate). Fiedler has practiced law for eighteen years and, in the last ten, has focused exclusively on employment law and civil rights law. Her extensive and successful record in employment discrimination cases demonstrates that she is a highly sought-after and skilled lawyer, as do the affidavits provided by other attorneys in support of her. Her rate of $375 is reasonable when compared to the other Des Moines employment discrimination attorneys who provided affidavits here: the lawyers with between five and ten years experience appear to charge around $200/hour, *see* Exhibits 10, 11, and those attorneys with more experience than Fiedler, like David Goldman, $400/hour, Exhibit 9, and Roxanne Conlin, $750/hour, Exhibit 8, charge more. Thus, I conclude that Fiedler's hourly rate of $375 is reasonable.

As to Timmer, I conclude that $200/hour is reasonable. Although Timmer has practiced for only six years, an hourly rate of $200 is consistent with other employment discrimination attorneys in Des Moines with between five and ten years experience. Moreover, Timmer is an extremely skilled jury trial lawyer and boasts an impressive record of cases, especially given the number of years she has practiced. Although the cold record does not do Timmer justice, anyone in the courtroom during the two-week trial in this case would agree with Roxanne Conlin that Timmer is "a bright and talented rising star." *See* Exhibit 8 at 2 (docket no. 81-8).

I am not concerned that the rates of $375 and $200/hour are higher than those that Fiedler and Timmer have often received in other cases, as "a reasonable hourly rate is not itself a matter of binding precedent," *Farbotko v. Clinton County of New York*, 433 F.3d

204, 208 (2d Cir. 2005), but, instead, a figure to be determined on a case-by-case basis. I conclude that Fiedler and Timmer's requested rates are reasonable, based on their skill and experience and the current prevailing market rate.

The defendants have not objected to the rates of Gilster's other attorneys, Judkins and McCarty, and I agree that their requested rates are reasonable, given their skill and experience and the prevailing market rate for employment discrimination lawyers. I also note that the defendants have not challenged Gilster's requested legal assistant rate of $80/hour, and I find that this rate is reasonable. I take issue, however, with the rates requested for law clerks and the legal secretary at Fiedler & Timmer. Gilster requests a rate of $90/hour for the firm's law clerks. Timmer reports, in her affidavit, that her firm ordinarily bills $90/hour to the firm's fee-paying clients for law clerk work. However, an "ordinary billing rate is not conclusively 'reasonable.'" *See McDonald*, 860 F.2d at 1459. The only evidence Gilster has supplied to establish the reasonableness of this rate comes from Roxanne Conlin, who reports in her affidavit that her firm charges an hourly rate between $110 and $165 for law clerks, and that courts have awarded hourly rates of $95, $90, and $75 for her law clerks. While these rates may be reasonable for Conlin's law firm, as she, herself, charges $750/hour, I find that $90/hour for law clerks is too high here. In determining a reasonable law clerk rate, I also draw on my own knowledge and experience. *See Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005) ("[W]hen fixing hourly rates, courts may draw on their own experience and knowledge of prevailing market rates."). As an adjunct law professor at Drake Law School in Des Moines, I stay familiar with prevailing market rates for law clerks, and I am aware that part-time law clerks are typically paid $15 to $25/hour, with a few large and speciality firms paying up to $30/hour. Of course, I recognize that the billing rate a firm charges for law clerks is

higher than the paycheck those clerks take home. I find that $60 is a reasonable hourly rate to award for Fiedler & Timmer's law clerks.

Additionally, I award no fees for work legal secretary Cheryl Smith completed. Secretaries' salaries come within a firm's overhead. Secretarial work on a case should not be billed to a client, nor to an opposing party in a fee shifting case. *See Emery v. Hunt*, 236 F. Supp. 2d 1033, 1036 (D.S.D. 2002) ("Certainly, nothing should be billed to the client for secretarial work or for tasks that should be done by secretaries."); *Miller v. Kenworth of Dothan, Inc.*, 117 F. Supp. 2d 1247, 1262 (M.D. Ala. 2000) ("[A]ttorneys generally should receive no compensation for time spent on purely secretarial or other nonlegal services, such as serving or filing documents . . ., that are appropriately performed by messenger, secretaries, or clerks who[se] services ordinarily are part of a law office's overhead and are not billable to a fee-paying client." (citation and internal quotation marks omitted)).

### 3. *Reasonable Hours Worked*

The defendants also object to the number of hours claimed by Gilster's attorneys. As a general matter, the defendants maintain that the hours worked here are excessive for a single plaintiff, two-defendant sexual harassment and retaliation case. More specifically, the defendants assert that work done by Fiedler, Timmer, and Judkins was duplicative. The defendants also note that Fiedler, Timmer, and Judkins frequently bill for time they spent discussing the case, and the defendants maintain that they "should not have to pay attorney fees for inter-office discussions among Plaintiff's attorneys." Defendants' Response at 5 n.4 (docket no. 107). Next, the defendants assert that Gilster's lawyers engaged in block-billing and request a fitting reduction in fees.

Although the affidavits of other employment discrimination lawyers in Des Moines were very helpful in determining the reasonableness of Gilster's lawyers' hourly rates, I

do not find them useful in evaluating the hours that Gilster's lawyers worked. Included in two of these affidavits are blanket statements about the reasonableness of the overall fees requested by Gilster's lawyers. *See* Exhibits 8, 9 (docket nos. 81-8, 81-9). These generalized assertions appear to be based on the length of the trial and the size of the verdict, but the lawyers making these statements are not familiar with the particular circumstances of this case, including the amount of pre-trial labor involved, the amount or type of discovery needed, how cooperative defense counsel was or was not, how the strategies of defense counsel might have increased or decreased the work Gilster's lawyers needed to perform, or how a host of other factors might have affected the effort required of Gilster's lawyers. Generally, unless a lawyer not involved with a case has reviewed the entire record and compared each entry with the work product produced, and then testifies as a expert witness regarding the reasonableness of fees, I find any assertions about the reasonableness of the hours worked or the overall fees to be of little, if any, real value, and often simply overreaching. This is especially true where opinions are expressed in affidavits and not subject to cross-examination. John Henry Wigmore described cross-examination as "the greatest legal engine ever invented for the discovery of truth." 5 JOHN HENRY WIGMORE, A TREATISE ON THE ANGLO-AMERICAN SYSTEM OF EVIDENCE IN TRIALS AT COMMON LAW § 1367 (3d ed. 1940). I have, on many occasions, observed statements made in affidavits evaporate when the affiant was cross-examined. Thus, I do not find these mini cottage industry, "you-scratch-my-back, I'll-scratch-yours" affidavits to be helpful in evaluating hours worked or the overall reasonableness of Gilster's requested fees.

### a. Reduction for Block-billing

I first address the defendants' objection to block-billing. Block-billing, that is, "billing entries that specify only the daily activities, but that do not specifically indicate

how much time was spent on each individual task," *Dorr v. Weber*, 741 F. Supp. 2d 1022, 1036 (N.D. Iowa 2010) (internal quotation marks omitted), impedes my ability to evaluate the reasonableness of the hours expended, because I cannot ascertain the amount of time spent on each task. Many entries by Gilster's lawyers are block-billed. *See* Exhibit 2 (docket no. 81-2). An example comes from Timmer's June 23, 2011, single entry for five hours of work: "drafted motion to amend and amended complaint, emails to Kristin re: filing of same, received and reviewed ICRC file, revised discovery requests to go out, email to Kristin." Exhibit 2 at 5 (docket no. 81-2).

My prior decisions, from as far back as my time as a magistrate judge in the early nineties, make clear that block-billing is anathema to me. *See, e.g.*, *Houghton v. Sipco, Inc.*, 828 F. Supp. 631, 643 (S.D. Iowa 1993), *vacated on other grounds*, 38 F.3d 953 (8th Cir. 1994); *see also Dorr*, 741 F. Supp. 2d at 1036; *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 245 F.R.D. 381, 390 (N.D. Iowa 2007). Gilster maintains that "[a]lthough Defendants criticize Attorneys Fiedler, Timmer, and Judkins for the use of block billing, there is no rule against it, so long as records communicate what was done and its connection to the case." Gilster's Reply at 6 (docket no. 110). Gilster's lawyers are clearly misinformed. In fact, there *is* a rule against block-billing, namely Local Rule 54.1, Attorney Fees, which states, in no uncertain terms: "The claimed amount must be supported by an itemization that includes *a detailed listing of the time claimed for each specific task* and the hourly rate claimed." N.D. IOWA L.R. 54.1(a) (emphasis added). This long-standing rule should come as no surprise to Gilster's lawyers, as the Northern District of Iowa shares it with the Southern District, which encompasses Des Moines, where Gilster's lawyers are based. Nor are the Iowa federal courts alone in their approach to timekeeping; the Supreme Court has counseled that, "[w]here the documentation of

hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433.

I disagree with the defendants that all of Gilster's block-billed entries should be stricken. Although Gilster has block-billed, I do not find a drastic reduction in fees to be necessary. Unlike other cases in which I have imposed a sizeable reduction in fees for block-billing where the lawyers also clearly sought far more fees than they deserved, *see, e.g.*, *Dorr*, 741 F. Supp. 2d at 1036-37, Gilster's billing records do not suggest frequent overreaching, though I agree with the defendants, as noted below, that some of the fees requested in Gilster's supplemental motion for fees are excessive. I impose a 3% across-the-board reduction in Gilster's attorney fees award, a solution approved by the Eighth Circuit as a remedy for pervasive problems in lawyers' billing records, *see Jensen v. Clarke*, 94 F.3d 1191, 1203 (8th Cir. 1996) (approving 10% reduction),[33] both to encourage compliance with the local rules and because Gilster's block-billing has, to a certain extent, hindered my ability to assess the reasonableness of her fee request.

### b.    *Reduction for Lack of Specificity*

I also impose a small across-the-board reduction in fees for lack of specificity in Gilster's billing records. For instance, Timmer bills for "legal research" on June 4, 2012, but fails to indicate what she researched, *see* Supp. Bill at 1 (docket no. 111-1), and Fiedler bills for "Emails from and to Brooke [Timmer]," *see* Exhibit 2 at 1 (docket no. 81-2), but does not indicate the subject of the e-mails. There are many other instances of inadequate documentation and specificity in Gilster's billing records. Specificity is the most vital tool in assisting courts in reasonableness review. Therefore, I find a 2% across-

---

[33] I impose this reduction on both the lawyers' fees and the legal assistant and law clerk fees, as both of the legal assistants and the law clerk reported block-billed entries.

the-board reduction is appropriate. *See Jensen*, 94 F.3d at 1203 (approving across-the-board reduction where "there were certain instances where the documentation was simply not sufficient to make an intelligent determination as to whether the hours expended were in fact reasonable" (citation and internal quotation marks omitted)).

### c.    Reduction for Failure to Follow Local Rule

Local Rule 54.1(a) requires that lawyers seeking fees "include a separate summary indicating the total time spent performing each of the following major categories of work;"

1. Drafting pleadings, motions, and briefs;
2. Legal research;
3. Investigation;
4. Interviewing;
5. Trial preparation; and
6. Trial.

N.D. Iowa L.R. 54.1(a). Gilster failed to include this required summary, which deprived me of a clear snapshot of how Gilster's lawyers spent their time. Furthermore, their block-billing practices made it nearly impossible for me to create my own summary of their activities, as I could not determine how much time they spent on each task. I impose an additional 2% across-the-board reduction for Gilster's failure to comply with the longstanding local rule regarding attorney fees, one that has applied to every fee application the Fiedler & Timmer law firm has ever made in the federal district courts in Iowa.

### d.    Reduction for Overstaffing

First, I question the defendants' general gripe that Gilster's firm assigned too many lawyers to "a straight-forward Title VII (and Iowa state law) sexual harassment and retaliation case." Defendants' Response at 1 (docket no. 107). Is this case truly as straightforward as the defendants claim, when the defendants still maintain that there was

insufficient evidence to establish sexual harassment and retaliation? *See Casey*, 12 F.3d at 805 ("The City could not continue to contend that they have no liability here at all, with one breath, and then assert that this case was a 'pushover' for plaintiff with the next."). Moreover, "[w]hile sex discrimination claims, in general, are not particularly novel, discrimination cases are notoriously difficult to win." *Lewis v. Heartland Inns of Am., L.L.C.*, 764 F. Supp. 2d 1037, 1044 (S.D. Iowa 2011). This was a fact-intensive case that required Gilster to marshal and organize extensive evidence, particularly to establish causation for her retaliation claim. Central to Gilster's strategy for proving retaliation was evidence that nearly every Primebank employee turned against Gilster, which involved deposing numerous Primebank employees and preparing for a lengthy trial. Thus, while this case did not involve a novel legal question, it certainly entailed significant evidentiary hurdles. Given the time and labor required here and the inevitable difficulties in proving a discrimination and retaliation case, *see Johnson*, 488 F.2d at 717-19 (considering, as factors in fee award, time and labor required and difficulty of the legal question in determining attorney fees), I find it reasonable that Timmer, a partner, and Judkins, an associate, were the two main lawyers on Gilster's case, and that another partner, Fiedler, and an associate, McCarty, contributed a small amount of additional work. I recognize that defense counsel Doug Phillips is the platinum standard of efficiency and, without a doubt, an incredible bargain for his clients. He has tried many cases before me, and he has never used co-counsel. Nonetheless, he is the exception, not the rule, and it is not unreasonable that Gilster's firm used several lawyers in this case, particularly where the bulk of fees were generated by Timmer and Judkins, who both actively participated in the jury trial in this case.

While I reject the defendants' general contention that too many lawyers worked on this case, I now consider each of the defendants' more specific overstaffing concerns.

"[W]here more than one attorney represents the prevailing party, the contribution of all attorneys must be taken into consideration and the fees awarded should reflect the efforts of all, at least to the extent that the time reported does not reflect duplication of effort or work that would be performed by nonlawyers." *A.J. by L.B. v. Kierst*, 56 F.3d 849, 863-64 (8th Cir. 1995) (quoting *Reynolds v. Coomey*, 567 F.2d 1166, 1167 (1st Cir. 1978)); *see also Hensley*, 461 U.S. at 433 (noting that district court should reduce requested hours for "overstaffing"). Nonetheless, "the mere fact that more than one lawyer toils on the same general task does not necessarily constitute excessive staffing." *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 297 (1st Cir. 2001).

Although the defendants claim that Fiedler, Timmer, and Judkins's hours were "repetitive and duplicative," the only example the defendants cite, regarding Gilster's original motion for fees, is that Timmer and Judkins "were both billing 8-12 hour days for trial preparation." Defendants' Brief at 5 (docket no. 107). I do not find it unreasonable that Timmer and Judkins, who shared trial duties equally, would both work long hours in the days leading up to trial. As to Gilster's supplemental motion for fees, the defendants note that both Timmer and Judkins appeared for oral arguments on post-trial motions, although only Timmer participated. The defendants also object to the fact that "[f]our lawyers spent 65 hours doing research, writing briefs, talking to each other and editing each other's work, in preparing a resistance to the post trial motion." Defendants' Response at 1 (docket no. 113).[34] I agree with the defendants that the hours claimed by

---

[34] The defendants do not explain how they calculated the hours Gilster's lawyers spent resisting the defendants' post-trial motion. I do not arrive at sixty-five hours when I calculate Gilster's lawyers' time. Moreover, only three lawyers worked on the resistance, as Emily McCarty's billing records show that she worked on supplemental briefing and front pay issues, but not Gilster's resistance.

Gilster's lawyers in their supplemental motion for fees are quite high, considering the work that was required of them. However, it is difficult for me to strike any specific hours or fees, due to Gilster's block-billing. Moreover, I find that the reductions I have already imposed for block-billing, lack of specificity, and failure to follow the local rules are sufficient to penalize Gilster for any minor overreaching in her billing records. Absent other allegations from the defendants of duplicative work, I am satisfied, after reviewing and comparing Fiedler, Timmer, Judkins, and McCarty's billing records, that the lawyers did not duplicate each other's efforts.[35]

Nevertheless, I do impose a small reduction in Fiedler's fees, as her billing records indicate that, to some extent, she played an advisory and mentoring role in this case, offering revisions on Timmer and Judkins's written work, suggestions throughout the case, and advice at trial. *See* Exhibit 2 at 1-2 (docket no. 81-2). While I do not doubt that Fiedler's work, in this capacity, helped Timmer and Judkins present the best case possible for Gilster, I will not shift to the defendants the expense of training and advisory work that Fiedler is expected to perform as a senior partner. *See Emery*, 236 F. Supp. 2d at 1036 ("[Lawyers] often ask [a] more experienced lawyer what to do in a given case and that is all as it should be. The client, however, should not be responsible for any such activities."). To the same extent a client would not be expected to pay for the mentoring and advice of a senior partner, the defendants in this fee-shifting case should not have to pay for Fiedler's advice, either. *See Hensley*, 461 U.S. at 433-34. ("In the private sector,

---

[35] I also note that Gilster's lawyers accepted this case on contingency and, therefore, faced an economic incentive not to sink unnecessary hours into this case. *See Johnson*, 488 F.2d at 717-19 (considering whether lawyers accepted case on fixed or contingency fee basis). Of course, this incentive largely disappeared after Gilster won her case.

'billing judgment' is an important component in fee setting. . . . Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." (citation and internal quotation marks omitted)). To account for the time Fiedler spent giving advice, I impose a 25% reduction in her fees.

The defendants also argue that they should not have to pay for discussions and e-mails among Gilster's attorneys. Certainly, when multiple attorneys work together on a single case, they must communicate to coordinate their efforts and to strategize about the case. *See Davis v. City & County of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992), *vacated in non-relevant part on denial of reh'g*, 984 F.2d 345 (9th Cir. 1993) (rejecting the defendant's "assertions that [plaintiffs'] counsel billed excessive hours for time spent in co-counsel meetings . . . [because plaintiffs'] counsel presented comprehensive and persuasive evidence . . . of the efficient and essential nature of their co-counsel meetings."). Indeed, communication among lawyers should help to improve efficiency and *avoid* duplicative and repetitive efforts. *Cf. A.J. by L.B.*, 56 F.3d at 864 (noting that court may reduce fees for "inefficiency . . . where more than one attorney is used."). I find that Gilster's lawyers properly billed for their time spent cooperating and strategizing with each other on Gilster's case. Moreover, the time they spent on co-counsel discussions and e-mails is reasonable, unlike other cases in which I have reduced time that lawyers spent conferring because it was clearly excessive. *See, e.g.*, *Houghton*, 828 F. Supp. at 645-48.

### e.    *Problems with Billing Judgment and Format*

Although Timmer's affidavit states, "I have deleted from the statement of account any time that was excessive, redundant, inefficient, or unnecessary[,]" Exhibit 3 at 5 (docket no. 81-3), there is a difference between *claiming* to have exercised billing judgment and *establishing*, *with evidence*, the exercise of billing judgment. There is no indication in the billing records of what fees, if any, Gilster's lawyers decided to exclude.

I have no way of knowing whether this is simply boilerplate fee affidavit language, or whether some billing judgment was actually exercised in this case. *See Hensley*, 461 U.S. at 433-34 (noting that billing judgment is just as essential in fee-shifting context as when billing to clients). Nonetheless, because Gilster's records do not suggest pervasive overreaching, I impose no reduction for failure to exercise billing judgment, but I note, for future fee shifting cases, that lawyers' billing records and affidavits should show, with precision, which hours and fees the lawyers cut, and why.[36]

Additionally, the format of Gilster's billing records makes it difficult for me to compare the work of each of her lawyers on a day-to-day basis. Gilster's billing records are grouped by lawyer and show the work each lawyer performed on the case, from beginning to end. I suggest, instead, that lawyers' billing records be grouped by day and list, for any given day, the work that each lawyer, legal assistant, and law clerk performed. This format, for cases involving multiple lawyers, facilitates the court's evaluation of whether lawyers duplicated efforts and if the time spent on various tasks was reasonable. Indeed, this was the first fee request that I have seen, in my time as a lawyer and a judge, that grouped hours by lawyer, rather than by day. I impose no reduction here but simply make a recommendation for the future.

---

[36] For instance, Judkins billed for her appearance at oral arguments on post-trial motions but did not participate. Though it was a useful educational experience for Judkins to be present at oral arguments, as she and Timmer shared the work of the trial and the post-trial motions, this does not mean that a client, or a defendant in a fee-shifting case, should be made to pay for Judkins's appearance at oral arguments, where she did not actually participate. This would have been a perfect opportunity for Gilster's lawyers to exercise billing judgment.

### 4.    *Calculation of Fees*

Therefore, the calculations for the adjusted lodestar, with my reductions, are, as follows:

**FEES FOR ATTORNEYS**

| Name | Hrs. | Rate | Fee |
|---|---|---|---|
| Brooke Timmer | 444.1 | $200 | $88,820.00 |
| Whitney Judkins[37] | 542.3 | $125 | $66,475.00 |
| Paige Fiedler[38] | 25.2 | $375 | $9,450.00 |
| Emily McCarty | 12 | $150 | $1,800.00 |
| **Total Hrs.** | 1023.6 | **Fee Subtotal** | **$166,545.00** |

**FEES FOR LEGAL ASSISTANTS AND LAW CLERK**

| Name | Hrs. | Rate | Fee |
|---|---|---|---|
| Robin Daisy-Jahn | 64.9 | $80 | $5,192.00 |
| Kristin Erdman | 14.15 | $80 | $1,132.00 |

---

[37] Because Judkins reduced her initial fee request from $59,287.50 to $57,975.00, to calculate her total fees, with her supplemental hours included, I add the value of those supplemental hours, $9,025.00 (72.2 x $125), to $57,975.00, to arrive at $67,000 for 546.5 hours of work. However, I subtract 4.2 hours, or $525.00, from Judkins's total fees. The defendants challenge Judkins's October 26, 2011, entry, which included "begin copying exhibits." Exhibit 2 at 11 (docket no. 81-2). I agree that Judkins cannot bill for that secretarial task. Because copying exhibits is included as part of an 8.4 hour block-billed entry, I have no indication of how long Judkins spent copying exhibits. Therefore, I strike half of her hours from that day, for a reduction of 4.2 hours. I reject the defendants' contention that Judkins's October 26, 2011, entry for "discussion with Kristin [legal assistant] re: scheduling depositions and court reporter" was improper billing for an administrative task, as it appears that Judkins only billed for the time necessary to direct her legal assistant to draft notices of depositions. *See* Kristin Erdman's Entry for October 26, 2011, Exhibit 2 at 3.

[38] Fiedler's total hours worked are 33.6. I impose a 25% reduction to arrive at 25.2.

| Law Clerk | 11.65 | $60 | $699.00 |
|-----------|-------|------|---------|
| **Total Hrs.** | 90.7 | **Fee Subtotal** | **$7,023.00** |

| | |
|---|---|
| **Combined Fee Subtotal** | **$173,568.00** |
| *less* | |
| 7% across-the board reduction (3%—block-billing; 2%—specificity; 2%—local rule violation) | $12,149.76 |

| | |
|---|---|
| **TOTAL  ATTORNEY FEES AWARD** | **$161,418.24** |

I find that this adjusted lodestar represents a reasonable fee award for Gilster's lawyers.  They worked very, very hard and achieved impressive results for Gilster, as shown by the jury's large—but appropriate—compensatory and punitive damages awards.  Gilster's lawyers also secured a considerable front pay award.  I have encountered many fee requests for simpler, shorter trials, with less skilled counsel, in which the fees sought were substantially higher than those Gilster requests here.   Thus, considering the exceptionally high "degree of success obtained,"[39] *see Hensley*, 461 U.S. at 436; *Johnson*, 488 F.2d at 717-19 (considering results obtained and amount involved as factors in fee award), I find $161,418.24 to be a reasonable attorney fees award.

---

[39] Because Gilster's level of success, as a whole, was so great, I do not discount the fees award due to Gilster's lack of success on injunctive relief.  *See Jenkins by Jenkins v. State of Mo.*, 127 F.3d 709, 716 (8th Cir. 1997) ("The most important factor in determining what is a reasonable fee is the magnitude of the plaintiff's success in the case as a whole.  *See* [*Hensley*, 461 U.S.] at 436; *Farrar v. Hobby*, 506 U.S. [103,] 114 [1992].  If the plaintiff has won excellent results, he is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which he did not win. *See Hensley*, 461 U.S. at 435.").

## 5.    *Award of Costs*

Gilster also seeks $20,537.28 in costs and expenses.  The defendants object, maintaining that the following costs requested by Gilster are not recoverable: Westlaw and Pacer expenses, witness preparation and jury consultation fees, background searches and investigation services, deposition expenses, postage, lodging, mileage, faxes and scanning, and telephone charges.

Federal Rule of Civil Procedure 54 governs awards of costs to prevailing parties. FED. R. CIV. P. 54(d)(1) ("[C]osts--other than attorney's fees--should be allowed to the prevailing party.").  The amount of costs awarded is "within the sound discretion of the district court." *Poe v. John Deere Co.*, 695 F.2d 1103, 1108 (8th Cir. 1982).  However, the district may only award those costs "set out in 28 U.S.C. § 1920 *or some other statutory authorization*." *Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 889 (8th Cir. 2006) (emphasis added).  Both Title VII and the ICRA provide for the award of costs to prevailing parties.  42 U.S.C. § 2000e-5(k); IOWA CODE § 216.15(9)(a)(8); *see, e.g.*, *Landals*, 454 N.W.2d at 898.  The Eighth Circuit Court of Appeals has explained that the taxable costs enumerated in 28 U.S.C. § 1920[40] do not constrain district courts when awarding costs to a prevailing plaintiff in a Title VII case.  *See Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1036 (8th Cir. 2008).  Rather, the court, following other circuits, has "construed 2000e-5(k) as allowing the award of reasonable out-of-pocket

---

[40] 28 U.S.C. § 1920 permits a court to tax "Fees of the clerk and marshal," "Fees for printed or electronically recorded transcripts necessarily obtained for use in the case," "Fees and disbursements for printing and witnesses," "Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case," "Docket fees under section 1923 of this title," "Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."  28 U.S.C. § 1920.

expenses incurred by the attorney which are normally charged to a fee paying client." *See id.* (citation and internal quotation marks omitted). It appears that the defendants' objections to Gilster's requested costs, to some extent, are based on the mistaken assumption that Gilster can recover only those costs permitted by 28 U.S.C. § 1920. Nonetheless, I consider each argument, keeping in mind that "[t]he losing party bears the burden of overcoming the presumption that the prevailing party is entitled to costs . . . ." *168th & Dodge, LP v. Rave Reviews Cinemas, LLC*, 501 F.3d 945, 958 (8th Cir. 2007).[41]

First, the defendants challenge Gilster's request for Westlaw research fees and Pacer fees, arguing that Eighth Circuit law does not permit a party to recover such costs. *See Leftwich v. Harris-Stowe State Coll.*, 702 F.2d 686, 695 (8th Cir. 1983) ("[C]omputer-aided research, like any other form of legal research, is a component of attorneys' fees and cannot be independently taxed as an item of cost in addition to the

---

[41] Although the defendants bear the burden to overcome the presumption that Gilster is entitled to costs, I note that Gilster still must provide me with adequate documentation to determine if her claimed costs are reasonable and related to the case. *See Baker*, 263 F. Supp. 2d at 1203 (denying costs that "were inadequately documented"). Gilster provided no receipts for her costs and expenses. Although Gilster offered, through Timmer's affidavit, to "provide more detailed documentation of such costs and expenses (such as receipts) to the Court upon request," Exhibit 3 at 5 (docket no. 81-3), I would be well within my discretion to deny costs entirely for Gilster's failure to provide documentation, initially, when she filed her motion for fees and expenses. This is the first fee request I have ever received without documentation attached for expenses. Neither defense counsel nor I should be put in the position of not being able to review Gilster's documentation of costs. Furthermore, I should not have to delay resolution of this case in order to request documentation that Gilster should have provided in the first place. I do not strike Gilster's costs entirely here, as I have great respect for Gilster's lawyers and do not doubt their integrity in billing costs and expenses, except for one minor matter, discussed later. Also, as noted below, I strike several expenses that are entirely vague and inadequately documented.

attorneys' fee award."); *see also Standley v. Chilhowee R-IV Sch. Dist.*, 5 F.3d 319, 325 (8th Cir. 1993) ("Based on *Leftwich*, the law of this Circuit is that computer-based legal research must be factored into the attorneys' hourly rate, hence the cost of the computer time may not be added to the fee award."). Although the Eighth Circuit Court of Appeals has not explicitly overruled *Leftwich* and *Standley*'s relevance in cases involving fee-shifting statutes, the court recently rejected their application to a negotiated settlement of a shareholder derivative case, reasoning that lawyers typically bill for computerized legal research fees and that "[t]he prevailing view among other circuits is to permit awards to reimburse counsel for the reasonable costs of online legal research." *See In re UnitedHealth Group Inc. S'holder Derivative Litig.*, 631 F.3d 913, 918 (8th Cir. 2011). Moreover, *Leftwich* and *Standley* predated *Sturgill*, in which the Eighth Circuit Court of Appeals interpreted Title VII's fee-shifting provision to allow courts to award reasonable costs that are "normally charged to a fee paying client." *Sturgill*, 512 F.3d at 1036. Computerized legal research fees are traditionally billed to clients, *see In re United Health Group*, 631 F.3d at 918, and, thus, if reasonable and adequately documented, should be awarded in fee-shifting cases. Nevertheless, although I read Eighth Circuit law to permit me to award computerized legal research fees, I do not award them here due to inadequate documentation. *See Baker*, 263 F. Supp. 2d at 1203 (denying costs that "were inadequately documented"). Gilster's entries in her itemized list of costs refer only to "research charges" or "Westlaw - research charges," but do not specify the subject matter of the research. Because Gilster has provided insufficient information for me to determine if these research costs were reasonable, I deny them and reduce her costs by $2,562.00. I disagree with the defendants that Pacer fees are not recoverable, as Pacer does not involve computerized legal research, but rather is an out-of-pocket expense a lawyer must pay to view court documents. The Pacer fees requested here are reasonable and

traditionally billable to a client and, therefore, are compensable. *See, e.g.*, *Helm v. Sun Life Assurance Co. of Canada*, No. CIV. 07-2112, 2009 WL 524937, at *2 (W.D. Ark. Mar. 2, 2009).

Next the defendants maintain that Gilster's witness preparation and jury consulting services fees are not recoverable. Gilster requests $3,379.35 for the use of Starr Litigation Services to prepare witnesses and to review jury questionnaires. The defendants are correct that courts have consistently found that consultant fees are not recoverable under 28 U.S.C. § 1920. *See, e.g., Jorling v. Habilitation Servs., Inc.*, No. CIV.A. 103CV00073-WO, 2005 WL 1657060, at *12 (S.D. Ohio July 14, 2005); *Simon Prop. Group, L.P. v. mySimon, Inc.*, No. IP 99-1195-C H/G, 2001 WL 66408, at *32 (S.D. Ind. Jan. 24, 2001). However, the question here is not whether § 1920 would permit such fees, but, rather, whether the consulting and preparation fees are "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client." *Sturgill*, 512 F.3d at 1036. This was a difficult case to win. Numerous defense witnesses contradicted Gilster's theory of the case, making Gilster's choice of jurors and preparation of witnesses all the more critical. I find that Gilster's use of witness preparation and jury consultant services was reasonable, as these services optimized her chances of winning a difficult case. *See Lewis*, 764 F. Supp. 2d at 1049 (rejecting defendants' argument, in Title VII and ICRA case, that expenses for mock jury trial were "luxuries" and finding that, because the focus-group exercise "contributed to the litigation . . . and benefitted [plaintiff's case]" by preparing plaintiff to testify, expenses were recoverable). Therefore, I award costs for Gilster's expenses from Starr Litigation Services.

The defendants also challenge Gilster's expenses for background searches on three former Primebank employees and for the services of an investigator. First, as to background searches, Gilster explains that, when the defendants did not voluntarily provide

contact information for former employees, Gilster's lawyers, in an attempt to avoid the costs of a deposition, ran background checks so they could contact and interview these employees informally. In light of this information, I find that the costs of background searches on these former employees were "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client." *Sturgill*, 512 F.3d at 1036. As to investigation services, Gilster explains that her lawyers employ an investigator, who contacts witnesses and interviews them at the rate of $25/hour. Gilster seeks to recover a May 17, 2010, $59.55 charge for "Investigation Services" and a May 12, 2011, $150.04 charge for "Investigation Services on Amber Lively, Erika Plendl, Austin Sitzmann." Exhibit 1 at 1. Gilster has not explained the first "Investigation Services" charge, and I cannot tell whom the investigator interviewed on this day. Because I cannot ascertain how this $59.55 charge was relevant to the case, I deny it. *See Baker*, 263 F. Supp. 2d at 1203 (denying costs that "were inadequately documented"). As to the charge for "Investigation Services on Amber Lively, Erika Plendl, [and] Austin Sitzmann," I know from trial that Amber Lively testified, but I have no idea who Erika Plendl and Austin Sitzmann are. The expenses for Plendl and Sitzmann may well have been compensable, had Gilster explained their relevance to this case. I deduct $100.04, approximately two thirds of the total charge, because I can only see how investigation of one of the three individuals was pertinent to the case.

Additionally, the defendants object to Gilster's request for $6,702.55 in deposition expenses, arguing that "deposition expenses . . . are only recoverable if utilized in a court proceeding." Defendants' Brief at 9 (docket no. 107). The defendants overstate the rigidity of the rule regarding deposition expenses. "Even if a deposition is not introduced at trial, a district court has discretion to award costs if the deposition was necessarily obtained for use in a case and was not purely investigative." *Smith*, 436 F.3d at 889

(alterations, internal quotation marks, and citations omitted). The defendants fail to indicate a single deposition that was not "necessarily obtained for use in [this] case" or that was "purely investigative." Rather, ignoring their "burden of overcoming the presumption that the prevailing party is entitled to costs," *see 168th & Dodge*, 501 F.3d at 958, the defendants simply ask "that all of the deposition and transcript costs be denied because Plaintiff has not delineated what depositions, if any, were needed for or used at trial." Defendants' Brief at 9 (docket no. 107). Gilster, in reply, notes that, of the five individuals she deposed whose depositions were not used at trial, three were disclosed by the defendants as witnesses with knowledge about Gilster's allegations, another was one of the first individuals to receive Gilster's internal complaint, and the fifth was involved in monitoring Gilster's e-mails. Therefore, I find that these depositions were "necessarily obtained for use in [this] case" and award all of Gilster's deposition costs.

The defendants also challenge Gilster's charge for a transcript of Matthew Ahlers's testimony, which Gilster requested during the trial. Gilster explains her request for the transcript, as follows: "Plaintiff requested the transcript as she believed after Mr. Ahlers's trial testimony that she might need to move for directed verdict on Defendants' affirmative defense regarding after-acquired evidence. After review, it was decided not to pursue the motion." Gilster's Reply at 14 (docket no. 110). A court may award the costs of trial transcripts under 28 U.S.C. § 1920 where "transcripts were not obtained primarily for the convenience of parties but were necessary for use in the case." *McDowell v. Safeway Stores, Inc.*, 758 F.2d 1293, 1294 (8th Cir. 1985). In light of Gilster's explanation of why she requested Ahlers's testimony and how she used it, I find that it was "necessary for use in the case" and that it is a recoverable cost.

Gilster's expenses for lodging, postage, faxes and long-distance phone calls are all "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client." *See Sturgill*, 512 F.3d at 1036.

However, I do not award mileage costs, though I recognize my discretion to do so. In addition to billing mileage, Timmer and Judkins billed their full hourly rate, for a combined total of $325/hour, for travel between Des Moines and Sioux City. I find that $325/hour for travel time adequately compensates Gilster's lawyers. Had they exercised billing judgment and reduced their hourly rates for travel time, or established the exercise of *any* billing judgment in the entire fee petition, I would be more inclined to grant them mileage costs. As it stands, however, I do not grant Gilster's mileage costs of $1,113.33, as I find them to be excessive. Gilster's lawyers are entitled to *reasonable* compensation of costs, not *all possible* compensation.

I also agree with the defendants that Gilster's "scanning" charges are not recoverable because Gilster does not explain why "scanning" resulted in any out-of-pocket expense to the Fiedler & Timmer firm. Thus, I deny that cost, which totals $380.55 for all scanning, for inadequate documentation. *See Baker*, 263 F. Supp. 2d at 1203.

Additionally, I deny Gilster's $50 charge for "supplies to open a new file."[42] Those charges are overhead not properly charged to a client or to a defendant in a fee-shifting case. Indeed, Judge Pratt in the Southern District of Iowa previously denied Fiedler & Timmer, then known as Fiedler Townsend & Newkirk PLC, this exact $50 charge for "supplies to open a new file," reasoning that opening a new file is "part of the cost of operating a law practice and not an 'expense' that can be recovered from defendants under the fee-shifting statute in this case." *See Hite v. Vermeer Mfg. Co.*, 361 F. Supp. 2d 935, 956 (S.D. Iowa 2005). Gilster failed to notify me that Judge Pratt previously denied this cost, even when, before I learned of Judge Pratt's opinion, I asked Gilster about the charge during oral arguments and expressed my belief that such costs were overhead and not recoverable. Although Timmer, Judkins and McCarty had not yet graduated from law school at the time of the *Hite* decision, Fiedler and her firm represented the plaintiff in *Hite*. Moreover, Fiedler's billing records reveal that she worked on the motion for attorney fees and costs here. Thus, there is no excuse for Gilster's failure to notify me of Judge Pratt's rejection of this "supplies to open a new file"

---

[42] Timmer's affidavit maintains, "All of the expenses submitted are those normally charged to fee-paying clients and all of them are expenses for which Plaintiff Mindy Gilster is personally responsible." Exhibit 3 at 6 (docket no. 81-3). However, to be compensable in a Title VII case, a cost must not only be normally charged to fee-paying clients; it must also be *reasonable*. *See Sturgill*, 512 F.3d at 1036. Lawyers cannot transform an overhead cost into a compensable cost in a fee-shifting case simply by arguing that their fee-paying clients are required to pay such a cost. Taken to its logical extreme, Gilster's lawyers' theory would require defendants, in fee-shifting cases, to pay plaintiffs' lawyers' rent, lighting, and janitor bills—as long as the lawyers' fee-paying clients had to do the same. Here, no matter whether Fiedler & Timmer's fee-paying clients have to pay the $50 new file charge, that cost is overhead and is not reasonably assessed against a defendant in a fee-shifting case.

cost.[43] While I do not believe that the failure to disclose *Hite* was unethical, as it was not controlling authority, *see* IOWA R. PROF'L CONDUCT 32:3.3(a)(2) ("[A] lawyer shall not knowingly . . . fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel . . . ."), the ethical rules set the *minimum* for professional conduct, and lawyers should strive for a much higher level of professionalism than the minimum required of them. Gilster was far from forthcoming with me.[44] Rather than attempt to sneak a $50 charge by me, Gilster should have informed me of *Hite* and, possibly, argued that it was wrongly decided. Of course, the more prudent approach, when seeking more than $180,000 in fees and costs, would have been not to claim this $50 file opening charge, especially in light of Judge Pratt's and my rather obvious objections. I impose an additional $1000 reduction in costs due to Gilster's failure to disclose a case involving this law firm and the very cost requested here.

---

[43] Furthermore, it is not unreasonable to believe that all of the lawyers in Fiedler's law firm have read *Hite*. First, Gilster cites *Hite* for a different proposition in her reply brief regarding attorney fees and costs. *See* Gilster's Reply at 3 (docket no. 110). Second, the firm specializes in employment discrimination law, and *Hite* is one of only two reported federal district court decisions in which Fiedler was awarded fees in an employment discrimination case. *See Hite*, 361 F. Supp. 2d at 956; *Van Horn v. Specialized Support Servs., Inc.*, 269 F. Supp. 2d 1064, 1076-77 (S.D. Iowa 2003). Thus, it is fair to assume that the other lawyers in Fiedler's firm have read *Hite*.

[44] Gilster's failure to disclose *Hite* would be less problematic if the decision came from a district court completely unrelated to the Northern District of Iowa, but *Hite* came from a colleague in the Southern District of Iowa, our sister district. In fact, we are more than sister districts because all five active district court judges in the Southern and Northern Districts of Iowa have a long-standing tradition of being officially cross-designated to work in both districts, and we frequently do so.

Therefore, from Gilster's requested costs and expenses of $20,537.28, I deduct[45] $5,265.47, to arrive at an award of costs and expenses of $15,271.81.

## D. Interest

In her second amended complaint, Gilster requests "interest as allowed by law." *See* Gilster's Second Amended Complaint at 9-10 (docket no. 22). Neither party mentioned the issues of pre- and post-judgment interest in its post-trial briefing.

### 1. Pre-judgment Interest

Because I allocated Gilster's past and future emotional distress damages and medical expenses to her ICRA claims, I consider pre-judgment interest on those damages under Iowa law. Although Gilster may recover back pay under either Title VII or the ICRA, for simplicity's sake and absent any indication from the parties to the contrary, I consider interest on her back pay award under Iowa law, as well. Iowa law permits "[i]nterest . . . on all money due on judgments," IOWA CODE § 535.3(1), including judgments under the Iowa Civil Rights Act, *see, e.g.*, *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 896 (Iowa 1990). Because "prejudgment interest . . . reflects the lost value of the use of the money awarded," *In re Marriage of Baculis*, 430 N.W.2d 399, 401 (Iowa 1988), pre-judgment interest on awards of future damages is not appropriate. Thus, I award pre-judgment interest on the jury's awards of past emotional distress damages, medical expenses, and back pay. *See, e.g.*, *Heaton v. Weitz Co., Inc.*, No. 05-CV-102-LRR, 2007 WL 2301251, at *12 (N.D. Iowa Aug. 8, 2007) (awarding pre-judgment interest under

---

[45] I calculate the total deduction, $5,265.47, as follows: $2562 for inadequately documented Westlaw research charges; $159.59 for inadequately documented investigation services; $1113.33 for mileage; $380.55 for scanning; $50 for supplies to open a new file and $1000 for failure to disclose *Hite*.

Iowa law on lost wages, benefits, and emotional distress damages); *see also Flockhart v. Iowa Beef Processors, Inc.*, 192 F. Supp. 2d 947, 978 (N.D. Iowa 2001) (awarding pre-judgment interest on emotional distress and back pay awards). Pre-judgment interest on these awards shall run from the date Gilster filed this action, September 1, 2010, to the date the Clerk of Court enters judgment. *See* IOWA CODE § 535.3(1) (indicating interest should be calculated according to § 688.13); IOWA CODE § 688.13(1) ("Interest, except interest awarded for future damages, shall accrue from the date of the commencement of the action."); *accord Heaton*, 2007 WL 2301251, at *12; *Flockhart*, 192 F. Supp. 2d at 978. Interest shall be calculated at the rate indicated in Iowa Code § 688.13(3).

I do not award pre-judgment interest on Gilster's punitive damages award. Because the purpose of pre-judgment interest is to "compensate[] a plaintiff for . . . damages incurred," *see Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 674 (8th Cir. 1995) (ADEA case), I conclude that pre-judgment interest is not appropriate for an award that is intended to punish Primebank, not compensate Gilster. *See, e.g., Flockhart*, 192 F. Supp. 2d at 978 (denying pre-judgment interest on punitive damages in Title VII case); *Heaton*, 2007 WL 2301251, at *12 (same); *Madison v. IBP, Inc.*, 149 F. Supp. 2d 730, 782 (S.D. Iowa 1999) (same), *reversed on other grounds*, 257 F.3d 780 (8th Cir. 2001).

### 2. *Post-judgment Interest*

Federal law governs the question of post-judgment interest. *Maddox v. Am. Airlines, Inc.*, 298 F.3d 694, 699-700 (8th Cir. 2002). 28 U.S.C. § 1961(a) provides: "Interest shall be allowed on any money judgment in a civil case recovered in a district court." Thus, I award post-judgment interest, to accrue beginning on the date the Clerk of Court enters judgment in this case, at the rate identified in 28 U.S.C. § 1961(a), on the entire award: all compensatory damages and back pay, punitive damages, and front pay. *See Dollar*, 787 F. Supp. 2d at 928-29; *Heaton*, 2007 WL 2301251, at *12; *Madison*, 149

F. Supp. 2d at 783. I also award post-judgment interest on Gilster's attorney fees and costs, to accrue beginning on the date the Clerk of Court enters judgment in this case, at the rate identified in 28 U.S.C. § 1961(a). *See Jenkins by Agyei v. State of Mo.*, 931 F.2d 1273, 1276 (8th Cir. 1991).

## IV. CONCLUSION

### A. Orders Regarding Post-Trial Motions

1.  The defendants' Motion For Judgment As A Matter Of Law, New Trial, Or Remittitur (docket no. 82), is **granted in part** and **denied in part**, as follows:

> a) The defendants' motion for judgment as a matter of law is **denied.**

> b) The defendants' motion for new trial is **denied.**

> c) The defendants' motion for remitittur is **denied, except to the extent** that Gilster's back pay and medical expenses are reduced, by agreement of the parties; and Gilster's punitive damages award is reduced from $600,000 to $50,000, by agreement of the parties;

2.  Gilster's Motion For Equitable Relief And Front Pay (docket no. 80) is **granted in part** and **denied in part**, as follows:

> a) Gilster's request for injunctive relief is **denied**. However, I order that the parties agree on a neutral letter of reference for Gilster within 60 days of the entry of this order. I reserve jurisdiction for the limited purpose of supervising the parties' agreement on a neutral letter of reference.

> b) Gilster's request for front pay is **granted**. Gilster is awarded $108,831.80 in front pay.

3.  Gilster's Motion For Attorneys' Fees And Expenses (docket no. 81) is **granted in part** and **denied in part**.  Gilster is awarded $161,418.24 in attorney fees and $15,271.81 in costs.

4.  Defendant Primebank, Inc. is **dismissed** by agreement of the parties.

### B.  Summary of Damages

Gilster is entitled to the following damages:

| | |
|---|---|
| Past Emotional Distress | $40,000.00 |
| Medical Expenses | $1,330.49 |
| Back Pay | $28,820.12 |
| Future Emotional Distress | $200,000.00 |
| Punitive Damages | $50,000.00 |
| Front Pay | $108,831.80 |
| **Total Damages** | **$428,982.41** |

### C.  Order for Judgment

This case was hotly contested by excellent trial lawyers on both sides.  There was sufficient evidence on either side of each of Gilster's claims to support a verdict for or against either party.  Both sides struck hard blows; that happens in hard-fought jury trials with skilled trial lawyers.  The parties did not receive a perfect trial but, in my opinion, a very fair one.  The jury deliberated for a considerable period of time and crafted a thoughtful and nuanced verdict—a demonstration of precisely how our jury system is supposed to work and why the right to a jury trial is so precious.[46]  As then Justice William H. Rehnquist observed,

---

[46] "The right to a jury is the only right present in both the body of the Constitution and the Bill of Rights."  Jenny E. Carroll, *The Jury's Second Coming*, 100 GEO. L.J. 657, 673 (2012).

> The founders of our Nation considered the right of trial by jury
> in civil cases an important bulwark against tyranny and
> corruption, a safeguard too precious to be left to the whim of
> the sovereign, or, it might be added, to that of the judiciary.
> Those who passionately advocated the right to a civil jury trial
> did not do so because they considered the jury a familiar
> procedural device that should be continued; the concerns for
> the institution of jury trial that led to the passages of the
> Declaration of Independence and to the Seventh Amendment
> were not animated by a belief that use of juries would lead to
> more efficient judicial administration.  Trial by a jury of
> laymen rather than by the sovereign's judges  was important to
> the founders because juries represent the layman's common
> sense, the "passional elements in our nature," and thus keep
> the administration of law in accord with the wishes and
> feelings of the community.  O. Holmes, Collected Legal
> Papers 237 (1920).  Those who favored juries believed that a
> jury would reach a result that a judge either could not or would
> not reach.

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 343-44 (1979) (Rehnquist, J.,
dissenting) (footnote omitted).  In my opinion, the jury's verdict in this case represents the
layman's common sense view of the evidence and the collective community judgment of
the wrongfulness of the defendants' conduct.

THEREFORE, I order judgment be entered in favor of Gilster and against the
defendants in the amount of $70,150.61, the sum of her past emotional distress damages,
medical expenses, and back pay award, plus pre-judgment interest from the date of the
filing of the complaint in this case to the date of the entry of judgment, at the Iowa rate of
interest.  Judgment shall also enter in favor of Gilster and against the defendants in the
amount of $358,831.80, the sum of Gilster's future emotional distress damages, punitive
damages, and front pay award, without pre-judgment interest.  Interest on the total
judgment, $428,982.41, shall accrue beginning on the date of the entry of judgment, at the

federal judgment rate. Gilster is also awarded $161,418.24 in attorney fees and $15,271.81 in costs; interest on attorney fees and costs shall accrue beginning on the date of the entry of judgment, at the federal judgment rate. Defendant Primebank, Inc. is ordered dismissed, by agreement of the parties.

**IT IS SO ORDERED.**

**DATED** this 14th day of August, 2012.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA